BRADFORD, Appellant, v. BLOSSOM et al.

**In Banc, June 28, 1905.**

1.  **WILL: Undue Influence: Proof.** Undue influence need not be shown by direct proof, but may be inferred from facts and circumstances. It may be shown by the relations of the parties, the mental condition of the testator, the character of the transaction, and the interest in the will of the party charged with exercising it.

2.  ———: ———: ———: **Question for Jury.** It is held in this case that the question of whether the will was the result of undue influence exercised upon the testatrix by the trustee should have been submitted to the jury.

3.  ———: ———: **The Evidence.** The defendant, a weak, delicate woman, very deaf, suffering at times with nervous exhaustion, possessed of about $350,000 worth of property, advised with defendant about her important business affairs and always in private. She had seven years before made another will, in which she made the defendant and another, who died four years later, trustees, and by which she gave one-half her property to her son

absolutely and the other half to her daughter absolutely, with the reservation for cross-remainders to the children of the other in case either died without issue. By this, she gave her entire estate to the defendant as trustee, not only for her children, but for their children and grandchildren that might be born during their lives, to act without bond, and with full power to appoint his successor by deed or will, and unlimited power of disposition and reinvestment of the fund. The will was prepared by defendant's lawyer from memoranda furnished by defendant and written by defendant, and there is no evidence that testatrix ever saw the memoranda. The lawyer, guided thereby, drew the will, and upon that draft defendant wrote material alterations, which were incorporated in the final draft. The lawyer had never seen the testatrix, and defendant at the time told him that she had no confidence in her son or son-in-law, and wanted a spendthrift trust as to both of them, whereas the evidence shows that she was very fond of her children and their children. Defendant further told him that in case the son died unmarried and without children he wanted the property to go to defendant's wife. When the will was to be executed defendant and testatrix came to the lawyer's office together, she produced the will, defendant retired, testatrix signed it and it was witnessed by the lawyer and his stenographer, then defendant returned, and he and testatrix went away together. The material differences between the will and the one executed by testatrix seven years before, when she was stronger in mind and body, were suggested by defendant's memoranda. There was no evidence that testatrix ever read the will or that she ever spoke to either of her children or to any other friend about having made it, and defendant did not testify. Beginning three years prior to the execution of the will and till her death five years thereafter, she became appreciably less able each year to follow her own inclinations. *Held*, that this was substantial evidence that the will was not her will, and that it was obtained by the undue influence of defendant, and the court erred in directing a verdict for proponents.

4. ———: ———: **Explanation.** Where such facts are proved as will authorize a jury to find the existence of undue influence, the burden shifts to the person who exercised it, and it devolves upon him to exonerate himself from the charge, in like manner as in case of fiduciary or confidential relations.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough*, Judge.

REVERSED AND REMANDED.

*M. F. Hanley* and *R. P. & C. B. Williams* for appellant.

(1)  If the person who sustains the confidential relation to the testator at the time of the making of the will is to get any pecuniary benefit, either directly or indirectly, under the will, a presumption of undue influence will be indulged.  Barkley v. Cemetery Assn., 153 Mo. 315; Lins v. Lenhardt, 127 Mo. 271.  (2)  Undue influence may be shown by the relation of the parties, the mental condition of the person whose act is in question, and the character of the transaction.  Dingman v. Romine, 141 Mo. 466.  (3)  That the testatrix had the power to dispose of her estate as she saw fit is undoubted, but when the will is unreasonable, the clearest evidence is required that it was the deliberate offspring of her own unbiased mind.  Harvey v. Sullen, 46 Mo. 153.  (4)  Where the testamentary capacity of the testator, and undue influence exercised upon him are in issue, it becomes material to know what were his previous purposes, intentions and state of mind, and statements made by him at, before and after making the will in question are competent evidence for these purposes.  Thompson v. Ish, 99 Mo. 160.  (5)  In determining whether or not a will was the result of undue influence, it is proper to consider the mental and physical condition of the testator, and the will itself may be read to the jury.  The question should be determined in the light of all the circumstances.  Myers v. Hauger, 98 Mo. 433; Young v. Ridenbaugh, 67 Mo. 586; Crowson v. Crowson, 172 Mo. 691.  (6)  Undue influence need not be shown by direct proof, but may be inferred from facts and circumstances.  Doherty v. Gilmore, 136 Mo. 414.  (7)  When the will is unreasonable in its provisions and inconsistent with the duties of the testator with reference to his property and family, this of itself will impose on those claiming under the instrument the necessity of giving some reasonable explanation of the

unnatural character of the will. Gay v. Gillilan, 92 Mo. 264. (8) In passing upon the capacity of a person to make a will, the will itself and all its provisions may be considered by the jury, and, while the fact that it is apparently unjust to his children is not of itself sufficient to invalidate it, yet it is a circumstance to be considered. Young v. Ridenbaugh, 67 Mo. 586. (9) Blossom sustained a confidential relationship to the testatrix. The will gives him a substantial and valuable interest, which he may transfer and assign for value; a presumption, therefore, of undue influence arises, which shifts the burden upon proponents. Lins v. Lenhardt, 127 Mo. 271; Barkley v. Cemetery Assn., 153 Mo. 315.

*Thos. B. Harvey* for minor respondents.

(1) This case should have gone to the jury. Merely the proof of Blossom's confidential relation to the testatrix, in connection with the will itself, under which he receives a very large and certain remuneration as trustee, and under which his wife may become a beneficiary, made a prima facie case and shifted the burden of proof to the proponents. The rule that a presumption of undue influence in the making of a will obtains where confidential or fiduciary relations exist, has its basis in the idea that some pecuniary benefit is to be derived, directly or indirectly, under the will by the person who sustains the confidential relations to the testator. Barkley v. Cemetery Assn., 153 Mo. 300; Lins v. Lenhardt, 127 Mo. 271; Tibbie v. Kamp, 154 Mo. 580. (2) The will itself bears strong evidence that it is not the free act and deed of the testatrix. It is absolutely inconsistent with her devotion to and love for these minors, her grandchildren, expressed in every other act of her life. It was undoubtedly her purpose for these children to get the benefit of this property during their minority, and then to come into the

absolute possession of it upon the death of their mother or upon attaining their majority. In the late case of Wood v. Carpenter, 166 Mo. 466, this court uses some very strong language in regard to the inherent proof of the capacity of a testator to make a will by the character of the instrument which was dictated, not by a lawyer, but by the testator, who was a carpenter, and written in the exact language which he used. To the same effect is: Myers v. Hauger, 98 Mo. 433; Young v. Ridenbaugh, 67 Mo. 586; Crowson v. Crowson, 172 Mo. 691; Gay v. Gillilan, 92 Mo. 264. (3) The testatrix was unquestionably in a weak physical condition and very nervous, making her dependent upon others, which conditions had begun to rapidly increase for two or three years prior to the execution of this will, which, together with her infirmity of deafness, made her an easy victim of anyone in whom she reposed especial confidence. Under such circumstances, this court has said it is proper to consider the will itself, the mental and physical condition of the testator, the relation between him and the person who influences the making of the will, and the character of the transaction; and the question of whether or not it is indeed his will, should be determined in the light of all the circumstances. Myers v. Hauger, supra; Young v. Ridenbaugh, supra; Dingman v. Romine, 141 Mo. 466; McKissock v. Groom, 148 Mo. 459; Cash v. Lust, 142 Mo. 630.

*Boyle, Priest & Lehmann* for respondents.

(1) There was no evidence whatever showing, or tending to show, fraud or undue influence by Blossom. Tibbe v. Kamp, 154 Mo. 545; Wood v. Carpenter, 166 Mo. 465; Hamburger v. Rinkel, 164 Mo. 398. (2) The evidence shows affirmatively that the will was deliberately and considerately executed, and carried out the long-fixed purpose of the testatrix. (3) There was no error in the rulings of the circuit court upon the admission and exclusion of evidence.

BURGESS, J.—This is a statutory contest of the will of Emma V. Bradford, who died July 28, 1898.

The will was admitted to probate August 8, 1898, and the contest proceedings were begun on October 10, 1899. The contestants are Frank E. Bradford and Caroline B. Ryan, son and daughter, and only children, of the testatrix. The will purports to have been executed on the 21st day of July, 1893. It reads as follows:

"I, Emma Virginia Burns Bradford, widow of the late William E. Bradford, of the city of St. Louis, State of Missouri, being of sound mind and memory and mindful of the uncertainty of life, do by these presents make, publish and declare the following instrument to be my last will and testament, hereby expressly revoking all other wills made and published by me.

## "I.

"I declare that I have now living two children, my son, Frank E. Bradford, and my daughter, Carrie Bradford Ryan, wife of Alfred Ryan; that I have no debts or obligations of any character to be allowed against my estate, except such as may accrue for my last sickness and funeral, and except such as may be secured on real estate purchased by me, for the deferred payments of the purchase price, for which I have hereinafter made special provision. And as to other debts and obligations, I direct my executor named to contest the validity of any claim against my estate which in his opinion is of long standing and supported by doubtful or uncertain evidence.

## "II.

"It is my will that all of my estate, real, personal and mixed, wherever situate, and to which I am entitled either at law or in equity, vested in me in fee simple, or otherwise, by virtue of any gift, grant, devise, inheritance, or by virtue of any conveyance made to any

trustee or trustees for my use and benefit, or under any power mentioned in such conveyance, which authorizes me to appoint, dispose or devise by last will and testament, or any other conveyance in the nature of a last will and testament, any of such property, real, personal or mixed, I do hereby will, devise and bequeath to my friend Howard A. Blossom.

"To have and to hold the same unto him, the said Howard A. Blossom, and to his heirs and assigns forever.

"In trust, however, for the following purposes, to-wit: To deliver to my daughter, Carrie Bradford Ryan, wife of Alfred Ryan, and to my son, Frank E. Bradford, out of my residence such statuary, pictures, laces, jewels, clothing and household goods, of equal value to each of said persons, as they may select; and if my said son and daughter cannot agree upon the articles to be selected by them then said trustee shall decide in all cases of disagreement and shall deliver such property as herein devised and bequeathed to him to said persons, as he may determine.

"And in further trust, as to all other property owned and possessed by me, or to which I am entitled either at law or in equity, to collect and receive all the rents, issues and profits thereof, and to pay all the taxes, assessments, insurance and repairs, and all other expenses which in the discretion of the said trustee may be deemed proper and expedient to be incurred in holding, managing, controlling and disposing of said property; and to pay out of said income (or the principal, if necessary), so held by said trustee, any sum or sums of money that may be recovered by any action at law or suit in equity against said trustee, by any person or persons whomsoever, for any damages or injuries sustained by any person or persons by reason of any act done, or omission of any act, by the said trustee, by which any cause of action for any injury or damage shall result, and for which any person or persons may

be entitled to recover against said trustee for such injuries or damages.  And from the net income thereof, after the payment of all such sums required herein to be paid by said trustee, to divide the said income into two equal parts; to suffer and permit my son Frank to use and enjoy so much of the one part of the said net income for and during his natural life as my said trustee may deem proper to pay him, such payment to be made to him in such sum or sums and at such time or times as said trustee may determine, paying the same into his own hands and taking his receipt therefor. And from the other part of said income to suffer and permit my daughter Carrie to use and enjoy so much of said part of said net income, for and during her natural life, as my trustee may deem proper to pay her, such payment or payments to be made to her in such sum or sums and at such time or times as said trustee may determine, paying the same into her own hands and taking her receipt therefor.

## "III.

"And in further trust, after the death of the said son Frank, in the event of his marriage and his wife should survive him, to suffer and permit his widow to use and enjoy so much of one-fourth of said net income (i e., one-half of his share), for and during the period of her natural life, if she shall remain the widow of my son Frank, as my trustee may deem proper to pay her, in such sum and at such times as said trustee may determine, paying the same into her own hands and taking her receipt therefor; and in case of her death or marriage all the share of my said son Frank in such income shall be paid to his child or children as hereinafter mentioned, in the manner hereinafter stated.

"And in further trust, that in case my said son Frank shall marry and any child or children shall be born of his body, who shall survive him, to suffer and

permit such child or children to use and enjoy so much of one-fourth of said net income (i. e., one-half of his share), for and during the period of the minority of such child or children, as my trustee may deem proper to pay to the lawful guardian of such child or children, in such sums and at such times as said trustee may determine; said payment to be paid into the hands of the said guardian or legal custodian of such child or children, or directly to such child or children, if my said trustee may deem such payment proper and expedient, and taking the receipt of such child or children therefor.

"And in further trust, that in case my said son Frank shall die without issue born of his body, leaving a widow, then one-fourth of the net income is to be added to the principal and held by the said trustee as herein provided for the disposal of the said principal.

"And in further trust, that in case of death of my said son Frank, unmarried, and without issue born of his body, and prior to the death of my daughter Carrie, then I direct my trustee to suffer and permit my daughter Carrie to use and enjoy as much of the said net income for and during her natural life as my said trustee may deem proper to pay her, in such sums and at such times as said trustee may determine, paying the same into her own hands and taking her receipt therefor.

## "IV.

"And in further trust, in case of the death of my said daughter Carrie, leaving a child or children born of her body, to suffer and permit such child or children to use and enjoy so much of said net income as she would be entitled to, if living, for and during their minority, as my trustee may deem proper to pay them, or the guardian or custodian of such children, in such sums and at such times as said trustee may determine;

said payments to be paid in the hands of said guardian or legal custodian, or directly to said child or children if my said trustee may deem such payment proper and expedient, and taking the receipt of such child or children therefor.

"And in further trust, that if my said daughter Carrie shall die leaving no children or their descendants, or in case of her death any of her children shall not attain the age of twenty-one years and shall die leaving no descendants, and my son Frank shall survive the said daughter Carrie and her said children and their descendants, or my said son Frank shall marry and leave any child or children born of his body surviving him, and after the death of my said daughter Carrie and her descendants and any of her children shall not attain the age of twenty-one years and shall die leaving no descendants, then my said trustee shall suffer and permit my said son Frank, or his child or children, to use and enjoy so much of the entire income of said estate, for and during their natural lives, as my trustee may deem proper to pay them, in such sums and at such times as said trustee may determine, and paying the same into their own hands and taking their receipt therefor.

"And in further trust, that in case my said son Frank shall die leaving no children or their descendants, or in case of his death any of his children shall not attain the age of twenty-one years and shall die leaving no descendants, and my daughter Carrie shall survive my said son Frank and his said children and their descendants, or my said daughter Carrie shall leave any child or children born of her body surviving her, and after the death of my said son Frank and his descendants and any of his children shall not attain the age of twenty-one years and shall die leaving no descendants, then my said trustee shall suffer and permit my daughter Carrie, or her child or children, to use and enjoy so much of the entire net income of said estate,

for and during their natural lives, as my said trustee may deem proper to pay them, in such sums and at such times as said trustee may determine, and paying the same into their own hands and taking their receipt therefor.

## "V.

"And in further trust, that if my said daughter Carrie shall die leaving a child or children who shall not attain their majority or leave descendants, and in case of the death of my son Frank, unmarried, or if married without children born of his body, or shall die leaving a child or children who shall not attain their majority or leave descendants, then I do will, devise and bequeath to Alfred Bradford and Charles H. Bradford, if they shall then be living, for and during their natural lives, and after the death of Alfred Bradford and Charles H. Bradford to the heirs of Alfred Bradford, a certain lot or parcel of land situate in the city of St. Louis, State of Missouri, being a lot of ground having a front of forty feet on the north line of Washington avenue by a depth of one hundred and twenty-five feet; said lot commencing at a point on the north line of Washington avenue ninety feet east of the east line of Sixth street, running thence north and parallel with Sixth street, one hundred and twenty-five feet, thence east and parallel with Washington avenue forty feet, thence south and parallel with Sixth street one hundred and twenty-five feet, then west along the north line of Washington avenue forty feet to the point of beginning. To have and to hold the above-described premises to the heirs of the said Alfred Bradford, and their assigns forever.

## "VI.

"And in further trust, that if my said daughter Carrie shall die leaving a child or children who shall not attain their majority or leave descendants, and in

case of the death of my son Frank, unmarried, or if married without children born of his body, or shall die leaving a child or children who shall not attain their majority or leave descendants, then in trust to convey all the rest, residue and remainder of my estate, real, personal and mixed, including both principal and income thereof, to the legal heirs of my two sisters, Mrs. Margaret Burns Mygatt, deceased, late of Vicksburg, Mississippi, and Mrs. Caroline A. Burns Wood, deceased, late of Richmond, Virginia.

"To have and to hold the same unto them, and their heirs and assigns forever.

## "VII.

"And in further trust, that if my said daughter Carrie shall die leaving a child or children, and when the youngest of such children shall attain the age of twenty-one years, after the death of their said mother, and in case of the death of my said son Frank, leaving a child or children born of his body, and when the youngest of whom shall attain the age of twenty-one years, after the death of their said father, then I direct my said trustee to divide the principal of said estate into two moieties; one of which I direct he shall convey in fee simple to the child or children, or the descendants thereof, of my daughter Carrie, discharged of said trust, and the other moiety I direct said trustee to convey in fee simple to the child or children, or the descendants thereof, of my son Frank, discharged of said trust.

## "VIII.

"It is my will, and the said trustee is' further authorized and empowered that at any time during the life of my son Frank and my daughter Carrie, or at any time after the death of either of them and during the existence of the trusts hereinbefore mentioned and set forth, to sell and convey in fee simple, or lease for

a term of years, or mortgage, or convey by deed of trust, or otherwise encumber any or all of the real estate held and owned by me, or in municipal, State or county bonds, for the same uses and trusts and to pay over the income therefrom in the same manner as the rents and income of the real estate and other property are to be paid under the provisions hereof.

"And the said trustee is further authorized and empowered to pledge, hypothecate, mortgage or otherwise incumber any of the real estate herein devised, for the purpose of paying off any mortgage or other encumbrance existing upon any of the real estate herein devised, or to sell any of the real estate for the purpose of paying off any encumbrances.

"And the said trustee is hereby authorized to lease, sell and convey in fee simple, or otherwise dispose of any part or portion of any of the property so held by him in trust under the provisions herein, as he may deem expedient, it being left entirely to his discretion when such leases, sales, hypothecations and dispositions of said property shall be made.

## "IX.

"All of the property herein conveyed to the said trustee, including all rents, income and profits thereof, and which is held by him in trust for the use and benefit of the beneficiaries herein named, shall be disposed of and held by said trustee in the manner herein provided and in no other manner whatsoever, and neither my son Frank nor my daughter Carrie, nor their descendants, nor any beneficiaries herein named, shall have any right or power to sell, convey, mortgage, hypothecate or dispose of any interest or right in and to any of the trust property herein held by said trustee or his successor; such disposition is hereby prohibited by any beneficiary in this will.

## "X.

"And in further trust, that whenever the said Howard A. Blossom, trustee named herein of the trusts created by this will, shall become a non-resident of the State of Missouri, or shall desire to resign the said trusts herein created, he shall have full power and authority, at any time he may so desire, to appoint a new trustee in his place and stead, by an instrument in writing duly signed, sealed and acknowledged by him and recorded in the office of the recorder of deeds of the city of St. Louis. And the said Howard A. Blossom shall also have power in his last will and testament to appoint a new trustee in his place and stead, to execute the trusts herein created, in case of his death.

"And in further trust, that if the said Howard A. Blossom shall resign or shall die without appointing any trustee as his successor herein, then the Mississippi Valley Trust Company of the city of St. Louis shall become his successor of the trusts herein created.

## "XI.

"In conclusion I do hereby nominate and appoint my friend Howard A. Blossom executor of my will, and I do especially direct that he be authorized and empowered to qualify and perform all the duties required by the laws of the State of Missouri, as such executor, without giving bond to any person or to the State for such duties in said office. And it is my further will that said Howard A. Blossom, as trustee under the trusts herein created, shall perform the duties and obligations of said trust without being required to give bond to the State of Missouri, or to any beneficiary, or any person for the faithful discharge of his duties as such trustee.

"It is my further will, and I request and direct my executor to finally settle my estate and make distribution thereof as soon as the laws of the State will permit.

"In witness whereof, I have hereunto set my hand and seal this 21st day of July, A. D., 1893.

"EMMA V. BRADFORD (Seal.)"

The will is contested on the ground that it was procured by fraud and undue influence by the defendant, Howard A. Blossom.

The petition alleges that the said alleged will was procured to be drawn and prepared by said Blossom who was made executor therein, and to whom, and to his heirs and assigns forever, the property mentioned in said will, valued at $350,000, was devised and bequeathed in trust for the certain alleged purposes set forth in said will, and that the said Blossom, in fraud of the rights of the plaintiffs, and by his fraud and undue influence practiced upon Emma V. Bradford, procured the execution of said will; that the probate of said will was also procured by the fraud and deception of said Blossom, all for the fraudulent purpose of securing the benefit of said estate to himself and his wife, one of the contingent devisees in the said alleged will. It is further alleged that at the time the said will is claimed to have been executed, for several years prior thereto, and until the time of her death, the testatrix was physically delicate, weak and infirm, and that during all of that time she was suffering from extreme nervousness and other derangements that made her incapable of attending to her ordinary affairs; that during all of said time she was almost totally deaf, and by reason of her afflictions and condition she was wholly dependent upon others in the management of her household and business affairs.

None of the defendants filed answers to said petition except Howard A. Blossom and Ada E. Blossom and the two minor defendants by their guardian *ad litem.*

The answers of Howard A. Blossom and Ada E. Blossom, though filed separately, are in substance the same. In said answers it is alleged that the instrument

in contest was executed by Emma V. Bradford on the 21st day of July, 1893, and was duly attested and admitted to probate; that Howard A. Blossom was duly qualified as executor thereof and thereunder and that letters testamentary where duly issued to him in the probate court, and that at the time of the execution of said will said Emma V. Bradford was of sound and disposing mind and memory, and that the same was and is her last will and testament.

All other allegations in plaintiff's petition not expressly admitted are denied.

The minor defendants, who are the children of Caroline B. Ryan, by their guardian *ad litem*, Thomas B. Harvey, neither join, answer, admit or deny the allegations of plaintiff's petition as to fraud and undue influence, but submit their interests to and for the protection of the court.

The cause was submitted to the jury upon the following issue or instructions:

"The jury are instructed that the issue to be tried in this case is: Is the paper writing dated the 21st day of July, 1893, propounded as the last will and testament of Mrs. Emma V. Bradford, deceased, and witnessed by W. B. Thompson and Sophia C. Loessler, in truth and in fact the last will and testament of said Emma V. Bradford or not? and upon this issue the court instructs the jury that, under the pleadings and the law and the evidence, the jury must find that the paper writing, propounded as the last will and testament of Emma V. Bradford, which bears date of July 21, 1893, and attested by W. B. Thompson and Sophia C. Loessler, is in truth and in fact the last will and testament of said Emma V. Bradford."

To the action of the court in giving this instruction the contestants objected and excepted at the time.

Under the instructions of the court the jury found the following verdict:

"We, the jury in the above-entitled cause, do find

that the paper writing dated the 21st day of July, 1893, propounded as the last will and testament of Emma V. Bradford, deceased, is the last will and testament of said Emma V. Bradford, deceased.''

In due time the contestants filed their motion for a new trial, which being overruled, they saved their exceptions and bring the case to this court, by appeal, for review.

The facts disclosed by the record are substantially as follows:

Upon the issues presented the defendants adduced evidence which tended to show the due and proper execution and probate of the will in question.

The evidence on the part of the contestants showed that the will was drawn upon the request of the defendant, Howard A. Blossom; that W. B. Thompson, the attorney who drew said will, was and had been the acting attorney for said Blossom. Thompson testified that Blossom called at his office several times to see him about the preparation of the will; that he never saw Mrs. Bradford but one time and that was when she came to his office to sign the will, and that the data upon which the will was prepared and executed was furnished by Blossom; that Blossom made the memoranda with respect to the terms of the will and carried the same to Thompson. The memoranda on the paper delivered to Thompson were in the handwriting of Blossom; it included two sheets of paper. The first draft of the will was prepared from the memoranda contained in these two sheets of paper, the said memoranda being as follows:

"The income —

"To Carrie and Frank during their lives, equal parts.

"If Frank marries and has children, and dies, one-half of his share to wife, while a widow.

"To children

"If Frank marries, and has no children, and dies, one-half of his share

"To wife, while a widow

"To be added to principal and invested.

"If Frank's widow dies add the share to principal.

"If Frank does not marry, one-half of his share may be added to Carrie's allowance, at trustee's option.

"If Carrie dies, her income to her children as they may need, at trustee's discretion, and through her husband, or may direct payment of bills at trustee's discretion.

"If Carrie's children die, after Carrie and before their 21st year, their share to

"Frank if surviving, or his children, if any, or added to principal.

"As trustee may deem expedient at the time.

"The principal to the children of Frank and Carrie, *per stirpes,* at the age of twenty-one, or after the parents' demise.

"If Frank die, unmarried, his share to Carrie's children, if they survive to inherit as above, but if he leaves children, to them at the age of twenty-one, or after his death.

"If Carrie die, after her children, her share to Frank or his children.

"And if Frank or Carrie leave no lineal descendants, heirs of their bodies, then the estate shall not be turned over to the grandchildren, until they reach the age of twenty-one, respectively, or after the parents' death, and shall not be liable for debts made prior to actual possession.

"The income shall not be assignable for any purpose by C. Q. T., not liable for their debts either before or after testator's death.

"Be payable in such sums as trustee deems sufficient to keep them in comfort, and not wastefully, and any excess be divested and added to principal.

"The trustee has power to sell any or all for pur-

poses of reinvestment, to regulate in a reasonable degree the expenditure of C. Q. T. and to prevent extravagance, speculation or wastefulness.

"To invest principal or accumulations in real estate or other approved securities,

"To deduct from income, expenses and taxes for caring for estate,

"To advance temporarily a portion of income to either C. Q. T. if justified by his judgment.

"To relinquish the trust and transfer same to a trust company to be selected by him."

The will was first dictated by the attorney, Thompson, to his stenographer, who transcribed the same on yellow paper. Some corrections were made on this draft of the will by Blossom and some by the attorney, and from this the last draft was prepared.

Thompson testified that he prepared the first draft of the will and gave it to Blossom, and did not know what he did with it; that he never saw Mrs. Bradford until she came to execute the will and that he had no conversation with her about the preparation of the same, but that all the negotiations were had with and all the data gotten from Blossom.

The objections made by Blossom to the first draft of the will were made on the margin of the paper and by interlineations on the will. These objections and suggestions by Blossom, for the guidance of the attorney in making the last draft of the will, were made to suit Blossom's views, and the will prepared in accordance with his wishes. The objections by Mr. Blossom to the first draft of the will, and the alterations suggested therein by him, were very material and changed it in several respects.

Mr. Thompson testified that Blossom gave him all the information that he had in regard to the manner in which the trust in the will should be created, and explained the purpose of the trusts; that Blossom came to his office and stated that he wanted him to draw the

will of Mrs. Bradford; that he, Blossom, stated that Mrs. Bradford had two children, a son and a daughter, and that he wanted a spendthrift trust as to both of them; that she had no confidence in her son or daughter and that she wanted the will drawn in the way that it was drawn; that Blossom at the time made very uncomplimentary remarks about Mrs. Bradford's son and her son-in-law. Thompson also testified that Blossom stated that in case Frank Bradford died without children, when he was single, he, Blossom, wanted the property to go to his, Blossom's, wife, as she was the next nearest heir. He further testified that this was marked out or told to him by Blossom and that he pursued his directions in the preparation of the will; that he endeavored to so draw it as to make it impossible for Frank Bradford or his sister to touch the property during their lives, except to have the income from it, and the remainder was to go to their children; that his recollection was that, in the event of both son and daughter dying without issue attaining to the age of twenty-one years, or it may be further removed than twenty-one years, it was Blossom's desire that the property go to his, Blossom's, wife. Witness also stated that Mrs. Bradford brought the will with her when she came to sign the same; that this was the first time he had ever seen her and that he noticed that she was a very small, elderly woman; that a great many of the clauses of the will and the legal effect of them were discussed between him and Blossom; that Blossom brought him quite an elaborate memoranda in his, Blossom's, handwriting; that he took up the memoranda and discussed them with Blossom and what the rule of law was against perpetuities and how far these limitations could be over; that they discussed the nature of the powers that were to be given the trustee under the will, and that he told Blossom what these powers were and that they were to be wholly discretionary on the part of the trustee, and that he, Thompson, tried to form them in such a

way that the trustee should have absolute discretion. Witness further testified that the length of time the property in the will should remain in the hands of the trustee, or would probably remain in his hands, was discussed between him and Blossom; that it was understood that there would be life estates first carved, then contingent remainders, etc.; that Blossom, at the time, expressed to him the desire of tying up the estate in the hands of the trustee for an indefinite length of time, and that that was the purpose of drawing up the will; that he, Thompson, did not discuss the provisions of the will with Mrs. Bradford when she came to his office to execute it, or at any other time; that he did not read the will to Mrs. Bradford before she signed it, nor could he remember that she read the same in his presence.

Contestants then introduced in evidence a will purporting to have been executed by Mrs. Emma V. Bradford, dated the 21st day of June, 1886.

This will was shown to have been prepared for Mrs. Bradford, at her request, by one Thomas Metcalfe, an attorney then residing in the city of St. Louis. The will gives to Frank Bradford, absolutely and in fee simple, one-half of all the property the testatrix might die seized and possessed of, to be used and disposed of as he might see fit, and in the event of his death, said property to go to his children, and if he should be dead at the time of the death of said testatrix, leaving no children surviving him, then the property was to go to Alfred Bradford and Howard Blossom as trustee for Caroline W. Ryan, to hold said property in trust for her sole and separate use and benefit during her natural life, and upon the death of her, the said Caroline W. Ryan, the property to go and vest in her children, and if she should leave no child surviving her, then the property to vest in the nephews and nieces of the testatrix, that is, to the children of Carrie A. Wood and Margaret Mygatt, sisters of the testatrix. The remaining one-half of the property of

the testatrix, so given to Alfred Bradford and Howard A. Blossom, as trustees, to hold in trust for the sole and separate use and benefit of Caroline W. Ryan for and during her natural life, free from the claim or control of her husband, Alfred Ryan, or any other husband she might have should he die and she marry again. The property was to be free from the debts of her husband and was to be used by her trustees for her own maintenance and support and the maintenance and support of her children. The trustees, as to the bequest of Caroline W. Ryan, are vested with the power to dispose of any of the real estate and reinvest the proceeds. If she should die leaving children, then the property was to vest absolutely in fee simple in said children or their guardian, and the said trustees were directed to transfer and convey said property to them. In the event the said Caroline should die, leaving no children, then such property was to go to and vest in Frank E. Bradford, and if he should die, leaving children surviving him, then it was to go and vest in his children. In case of the death of Frank Bradford, at the time of the decease of the testatrix, leaving no children surviving him, and if Caroline at the time of her death leave no children surviving her, then and in that event the property described and known as numbers 515 and 517 Washington avenue, in the city of St. Louis, was to go to Alfred Bradford and Dr. Charles Bradford, and if either should be dead and leave no children surviving him, then his survivor or his children to have the whole of said property. Then it provided that all of the remainder of the property of the testatrix in this contingency, that is, in the event of the death of Frank E. Bradford and Caroline Ryan without children surviving them, was to go to the nephews and nieces of the said testatrix, that is, to the children of her two sisters, or if either of them should die leaving children, the part of such decedent was to go to and vest in his or

her children and if either should be dead, without children surviving him or her, then his or her part to go to the survivors or their children. Alfred Bradford and Howard A. Blossom were made executors in this will. Mr. Metcalfe, the attorney who prepared this will, testified that he had acted as attorney for Mrs. Bradford in the administration of her husband's estate, and that he had known her since 1886; that he prepared this will from information received from Mrs. Bradford, that is, she directed him as to the manner in which the will was to be drawn, and the terms thereof. At the time of the preparation of this will Metcalfe says that Mrs. Bradford was somewhat deaf.

Dr. Goodman testified that he was a practicing physician, that he attended Mrs. Bradford in 1892 and that at the time she was in a very nervous condition; that she had been ailing for some time before he visited her, and that she was then a very delicate woman.

Mrs. Ryan, the daughter of Mrs. Bradford, testified that her mother had always been a very delicate woman as long as she could remember, since 1875 or 1876; that her average weight was about 75 or 80 pounds, and that her mother always suffered from nervousness, caused from first one thing and then another, and that a trifling thing would upset her. She stated that her mother's hearing commenced to get bad in 1875 and gradually grew worse; that in the years 1892-3 she had to use an ear trumpet almost all the time. This witness testified that her mother died at Paul Smith's in the Adirondacks, July 28, 1898, and that her remains were brought back to St. Louis where she was buried; that she was buried on Saturday, the 30th day of July; that when her remains reached the city Mr. Blossom was at the station and that he made arrangements for the funeral; that she saw Mr. Blossom after the funeral, and that he spoke to her before they left the burial grounds; that he came out to the carriage in which she was sitting at the burial grounds and asked her if she was going

to her mother's house, to which she replied that she was, and that he seemed very much confused and didn't seem to like the idea of her returning to her mother's house; that she went from the burial grounds to her mother's house and that Mr. Blossom came to the house immediately after her. Counsel for the proponents objected to this line of testimony, the objection was sustained by the court, and contestants excepted. The witness also testified that on the next day, the 31st day of July, Mr. Blossom told them to meet him down town and open the will; that on Monday, the 1st day of August, they met at the office of the Missouri Safe Deposit Company, and Mr. Blossom took the will out of the box of the Safe Deposit Company; that they had no key to the box, and the same was broken open; that the will was in the box sealed up, and that on the back of the envelope was written, "Last will and testament of Mrs. Emma V. Bradford;" that after they got the will they all went to the probate court; that while they were in the probate court room Mr. Blossom retired for a few minutes taking the will with him, and that when he returned the envelope was broken and the will was out of the same, and that the envelope was not opened in their presence. She was asked if she had any conversation with Mr. Blossom after the probate of the will as to what she might expect in case a suit was instituted to contest the will, to which question counsel for the proponents objected, which objection was sustained by the court, and contestants excepted. Witness testified that her mother had great affection for her children and grandchildren; that she frequently visited her grandchildren and gave them presents at Christmas and on their birthdays.

Miss Julia Schofield, witness for contestants, testified that she had known Mrs. Emma V. Bradford ever since she could remember; that during the last nine years of her life, from the 1st of January, 1890, she was a member of Mrs. Bradford's household until her

death; that she was her confidential friend and her assistant; that she went with her upon all occasions, very nearly always, and assisted her about the house in every way to save her physical strength. She always accompanied her whenever she left the city; that Mrs. Bradford always left the city in the summer; that she was always with Mrs. Bradford during the time mentioned, excepting a few weeks of the year when she would go to her home in the country; that she was in the nature of a member of her family.

"Q.  I will ask you to state what was Mrs. Bradford's physical condition? A.  Well, there was a great change. When I first went there she was in a very different condition than the last years of her life. I could notice a very appreciable change each year. She would become less able to follow her inclinations. She could never have been called a strong woman and as I remember her, there were two very opposite sides to her life. There were days when she was ill, when she was suffering from nervous exhaustion and days when she was very bright and well; that was the condition when I first went there."

Witness testified further that these periods of depression would come one day out of each week; that when these spells of exhaustion were not on her, she was quite bright and sociable, though she could never be called strong; that Mrs. Bradford was a very small woman; that when witness first went to live with her, she, perhaps, weighed 85 pounds; that was in 1890. Witness said that as the time passed on from 1890 these periods of depression would become more frequent and longer in duration; that they seemed to undermine her physical strength as the years advanced; that her strength decreased from year to year.

"Q. Have you any particular recollection of her condition in the year 1893? A. Yes, she still had those days when she had spells of exhaustion, when she felt badly and was not able to go about her accustomed duties.

"Q. I will ask you to state if you noticed any appreciable change in her condition in 1890 and 1893? A. Yes, I think there was always a slight difference each year.

"Q. What do you mean by a slight difference each year? A. That she would become a little weaker each year; that those spells of exhaustion undermined her physical strength."

Witness says that when Mrs. Bradford recovered from those spells of exhaustion she might become, in a few hours, bright and active; that she had a very sociable, lively disposition when she felt well; that she would recover in a remarkably quick time. Witness says that Mrs. Bradford was always faithful and affectionate to her children, Mrs. Ryan and Mr. Bradford, and was very fond of her grandchildren; that she would exhibit her affections for her grandchildren by bringing them presents when she went away and would remember them at Christmas and at their birthdays.

Witness says that she had known Howard A. Blossom since her entry into the Bradford family; that she had heard Mrs. Bradford speak of Mr. Blossom many times; that she always spoke of him with confidence and respect; that Mrs. Bradford would talk over and consult with Mr. Blossom about her business affairs; that when Mrs. Bradford had any business of extreme importance she would advise with Mr. Blossom.

Witness says that she remembers two occasions when Mr. Blossom came to the house; that the first time he came was among the earlier few years of her being there; that on the occasion when Mr. Blossom came to the house, the conversation between him and Mrs. Bradford was always a private one; that she did not hear it. Witness remembers that the first time Mr. Blossom came to the house he did not remain longer than fifteen minutes, but the last time he might have remained a half an hour.

"Q. Did you see him on the occasion he came

there; did he remain long enough to write out any paper? A. Not any paper of any great length or importance I should judge; but he might have written— he had time to write something if he chose.

"Q. Look at these two papers, Exhibits A-1 and A-2, and state whether or not on any of these occasions, when Mr. Blossom came there, he remained long enough to write out that paper? A. Well, as I said, I don't know. Is that a matter of great importance, great thought? If it would take very much thought and was a matter of great consideration, I do not think that he could have, but if it could have been written easily and quickly, yes."

Witness says that she could not say whether either of these visits was in the month of June, 1893. She could not exactly locate the date. Witness says that Mrs. Bradford talked with her freely about her business; that she was not, however, her advisor, but she usually made a confidant of witness of whatever was upon her mind; that she never spoke to witness about having made Mr. Blossom executor in her will; that she never spoke to her at all about having made a will.

Upon cross-examination by proponents, witness said that she knew Mrs. Bradford nearly all her life; that she lived in her home since 1890, as a companion; that she went abroad with Mrs. Bradford in 1890; that as Mrs. Bradford grew older, she grew physically weaker; that mentally she was bright always; that Mrs. Bradford was considered a very bright, intelligent woman; that as her physical strength declined, her mental capacity was taken with her physical strength; that she was very weak during the last two years of her life; that Mrs. Bradford died in the year 1898; that in the years 1893-94-95 she was a woman of intelligence and knew her own will; that she was a woman of very strong will; that she was a very forceful, purposeful woman, eminently so; that she attended to her business with the assistance of her business agent, Mr. Rut-

ledge, who collected her rents, leased her property and did things of that kind; that Mrs. Bradford could handle her own finances at her house. Witness says that she did Mrs. Bradford's shopping and errands and paid a great many bills for her; that Mrs. Bradford was a sociable woman when she felt well; that there were times when she was perfectly prostrate; that she was a woman of strong, natural affections, fond of her children and fond of her grandchildren; that in the later years of her life, from what she told witness, she would say that she contributed largely to the support of her son and daughter; that her son did not depend upon her so much as her daughter, though he lived at home; that the daughter depended more. Witness says that William E. Bradford was dead at the time she went into the household; that Alfred Bradford did not die until 1890; that Alfred Bradford and Emma Bradford were on friendly terms. She had the greatest respect for him. Witness says that Mr. Blossom was at the house of Mrs. Bradford once to a dinner party; that he may have been there once or twice. Of course, she was not at home always, but she remembers these two times, absolutely. Witness says that she could not say that Mr. Blossom called at the house occasionally, unless it was when she was away, and so far as she knows and remembers the occasions when he came there were when he was sent for. Says that she cannot say that Mrs. Bradford went to see Mr. Blossom repeatedly, but she can say that she has heard Mrs. Bradford say that she would go and ask Mr. Blossom about so and so. She did not say it to her very often. She had Mr. Rutledge always to do it.

Upon redirect examination witness said that Mrs. Bradford spoke to her on a number of occasions about consulting Mr. Blossom about her business; that these were the occasions other than the ones when he came to her house. Witness says that Mrs. Bradford was very hard of hearing; that even when she went there

first she was very hard of hearing; that Mrs. Bradford never went out without her ear trumpet, after about the first year after witness went there. She became accustomed to using it more and more; that the trumpet always went with her when she left the house; that they got three trumpets abroad; that these trumpets were gotten in Europe and they were her constant companions; that Mrs. Bradford could be made to hear without the trumpet provided people understood how to talk to her and could talk loud enough, sitting close to her, if their voices were distinct.

Miss Sophy Loessler, the stenographer in Mr. Thompson's office, who copied the will, and was one of the attesting witnesses thereto, testified that when Mrs. Bradford came to the office of Mr. William B. Thompson for the purpose of executing the will, she was of the impression that she did not come alone, but that Mr. Blossom was with her; that he did not remain during the execution of the will, but introduced Mrs. Bradford and left, but afterwards came back and he and Mrs. Bradford left together.

The inventories, supplemental inventories and appraisement of the personal property of the estate of Mrs. Bradford were introduced by the contestants to show the value of the property devised and bequeathed in the will.

Proponents offered no evidence other than as to the formal execution of the will and the record of its admission to probate.

Since the cause has been pending in this court, Mrs. Ryan has dismissed her appeal, and the cause is now pending on the appeal of Frank Bradford.

The court by its instruction in effect told the jury that there was no substantial evidence before them which tended to show that the will in question was procured to be made through fraud practiced upon the testatrix, or undue influence exerted over her by the defendant, Howard A. Blossom; and the question is, was

there any evidence tending to show either one of these averments? If there was such evidence, the judgment must be reversed; otherwise, affirmed.

It is conceded that there was no direct evidence of either fraud or undue influence, but it is contended that contestants were not required to produce direct evidence of either in order to entitle them to go to the jury, and that if there was substantial evidence tending to show fraud or undue influence in the procurement of the will, this was all that was necessary in order to entitle the contestants, to have their case submitted to a jury.

Undue influence need not be shown by direct proof, but may be inferred from facts and circumstances. [Doherty v. Gilmore, 136 Mo. 414.] It may be shown by the relation of the parties, the mental condition of the person whose act is in question, and the character of the transaction. [Dingmam v. Romine, 141 Mo. 466].

At the time the will was drawn Mrs. Bradford was a weak, delicate woman, and had much confidence in the business capacity and judgment of defendant Blossom. While Mr. Rutledge was her regular adviser, she would talk and consult with Blossom about her business affairs, and when she had any business of extreme importance she would advise with him. It is true the evidence only shows the presence of Mr. Blossom at the home of Mrs. Bradford upon two particular occasions, one of which was several years before the execution of the will, at which time he did not remain longer than fifteen minutes. The last time, he remained about half an hour. When there, the conversations between him and Mrs. Bradford were always private. Mrs. Bradford's physical condition during the last nine years of her life was much worse than theretofore; the change was very appreciable each successive year. She became less able to follow her inclinations and, of course, more susceptible to the influence of others.

It is contended by contestants that the motive for the practice of fraud by Blossom in the procurement of the will is shown by the unlimited power and authority conferred upon him by the will with respect to the property disposed of by it, as well as the unreasonably long time that he might hold the property and draw commissions for handling it; that in certain contingencies mentioned in the will there is almost no limit to the time the property might remain in the hands of Mr. Blossom and furnish, in the way of commissions, a fruitful and perpetual source of revenue for him.

If the contingency mentioned in the seventh clause of the will should arise, the executor might hold the property and dispose of the income from it as he might see fit during the lives of Frank and Carrie, children of the testatrix, and after their deaths, if both of them should leave children, until the youngest of their children should have reached the age of twenty-one years. In the event of this contingency, after the death of the trustee, his representatives or assigns would be drawing commissions upon the property mentioned in the will; and all of the grandchildren of the testatrix, after the death of Carrie and Frank, who have reached the age of twenty-one years, would be deprived of the enjoyment of the property until the youngest child of each arrives at the age of twenty-one years.

In the event of the contingency mentioned in the third paragraph of the fourth clause of the will, the trustee would be entitled to hold the property and draw the commissions for handling the income of the same during the lives of Frank and Carrie; and if both should die, and Frank leave no children or descendants of children, and Carrie should leave children, then during the natural lives of all the children of Carrie, until they became extinct.

By this paragraph of the will the trustee is given the power to hold the property during the lives in being, Frank and Carrie, and during the lives not in being—

of children which might be born of Carrie after the death of the testatrix.

Mrs. Bradford always had great affection for her children and grandchildren, and, by will of July 21, 1886, she gave to her son Frank, absolutely and unconditionally, one-half of all her property, real, personal and mixed. This will was drawn at the request of Mrs. Bradford and Alfred Bradford, her brother-in-law, who were both present at the time, talked to the attorney who drew the will and told him what they wanted. She was then a small, delicate woman, but aside from her deafness there was no evidence of physical illness. When the will in contest was prepared she was not present, but the memoranda from which it was drawn were in the handwriting of and furnished by the defendant, Blossom, and the material changes which were subsequently made in the original draft of the will were made at his suggestion and from memoranda furnished by him. They were of course material, otherwise they would not have been suggested by him, and the will prepared in accordance therewith. So far as this record shows, there is not a scintilla of evidence which tends to show that Mrs. Bradford ever knew anything about the contents of this will or the changes that were made in the original draft thereof, and all that the record discloses, so far as relates to her connection with the will; is the simple fact that she signed it and requested the attesting witnesses to sign it as witnesses to her will. She was at the time not so very strong, either mentally or physically, as she was when she executed her will in 1886. The provisions of the two wills are in great contrast, much to the disadvantage of her heirs and their descendants, and without any cause or reason for it, so far as disclosed by the record, except such as might be inferred from the uncomplimentary remarks of Mr. Blossom, at the time he applied to Mr. Thompson to prepare the will, to the effect that Mrs. Bradford had no confidence in either her son or her son-in-law.

At the same time he told Mr. Thompson that in case Frank Bradford should die without children, when he was single, that he, Blossom, wanted the property to go to his, Blossom's wife; that she was the nearest heir he thought of. He did not say that Mrs. Bradford wanted the property to go to his wife, but that he did. He manifested a marked degree of interest in the matter of the will and the property of the estate. When Mrs. Bradford went to execute the will he took her to Mr. Thompson's office, introduced her to him, then withdrew until the will was executed by her, when he returned, and he and Mrs. Bradford left together. It seems somewhat strange that after Mr. Blossom took Mrs. Bradford to Mr. Thompson's office to execute the will, he should have retired therefrom while she was executing it and, after she had done so, return for her, unless it was to avoid any suspicion that might be occasioned by his presence when she signed the will, that she was executing the same by reason of his undue influence over her. At the burial of Mrs. Bradford he wanted to know of Mrs. Ryan which house she was going to live in, and when she stated that she was going to her mother's house, he replied, "You are, are you?" and, as the witness says, "seemed very much confused and did not seem to like the idea of my returning to my mother's house." All of these facts and circumstances must, under the instruction of the court, which was in the nature of a demurrer to the evidence, be taken as true, and when such facts and circumstances are considered in connection with the great confidence that the testatrix seemed to have had in Mr. Blossom, to the extent that when she had any business of great importance she would advise with him; the interest, both direct and indirect, that he had in the property described in the will; its remarkable provisions in many respects, especially in that it not only makes the defendant trustee for her children but also for their children or any grandchildren that might

be born to them during their natural lives, with full power upon his part to appoint his successor as trustee by instrument in writing, or in case of the trustee's death, then by will, without bond as executor or trustee of so large an estate, thus showing unbounded confidence in him, tend strongly to show that the instrument of writing is not the will of the testatrix, and that it was procured by undue influence on the part of Mr. Blossom, and at the least calls for an explanation from him. In Gay v. Gillilan, 92 Mo. l. c. 263, it is said: "And while it is true that undue influence will not .be presumed, yet, where such facts are proved as will authorize a jury to find the existence of undue influence, then the burden shifts, and it then devolves upon the party charged to exonerate himself from such charge in like manner as in the case of fiduciary or confidential relations." [Maddox v. Maddox, 114 Mo. 35.]

In passing upon the question as to whether or not a will is the result of undue influence the question should be determined in the light of all the circumstances connected with and bearing upon its execution, and the provisions of the will itself. [Myers v. Hauger, 98 Mo. 433.]

That the testatrix had the power to dispose of her property as she saw proper cannot be questioned, provided she was not unduly influenced in so doing, which we think, under the facts and circumstances disclosed by the record, was for the consideration of the jury.

Our conclusion is that the judgment should be reversed and the cause remanded for further trial. It is so ordered. *Gantt, Valliant, Fox* and *Lamm, JJ.,* concur; *Brace, C. J.,* and *Marshall, J.,* dissent.