REBECCA ROBERTS et al., Appellants, v. HERSCHEL BARTLETT et al.

Division Two, October 25, 1905.

1. **WILL CONTEST: Action at Law: When Matter for Jury.** A will contest is an action at law, and being such the appellate court will not reverse the judgment because the jury found against the weight of the evidence, but will do so only when, on an examnation of the testimony, no evidence is found to support the verdict or upon which it can be based.

2. ————: **Incapacity: Meaning.** Testamentary capacity means that the testator at the time of the execution of his will had sufficient understanding and intelligence to transact his ordinary business affairs and to understand the nature and character of his property and the persons to whom he was giving it.

3. ————: ————: **Capacity to Make Contract.** A man may be capable of making a will and yet incapable of making a contract or managing an estate.

4. ————: ————: **This Case.** The testator was at the time of executing the will eighty-five years old, and very feeble from old age and disease. In his younger years he was mentally strong, possessed a vigorous constitution, had a most successful career as a merchant, was scrupulously neat and clean in his dress and person, a liberal provider for his household, affectionate and kind to his relatives, who were the children of his half-brothers, and were at all times industrious and respectable, though poor. He frequently visited them and they did him. At about the age of seventy he began to fail both physically and mentally, but his break-down was slow until about four years prior to the execution of the will, but thereafter was rapid. He began to have many delusions, illusions and hallucinations which were utterly groundless and during the last year of his life, within which he executed the will, he suffered from senile

dementia, which incapacitated him for transacting his ordinary business and caused him to be suspicious of those about him whom he had formerly held in high regard, and caused a complete change in his habits of life; he became absolutely filthy, utterly oblivious to his personal conditions, and his home was unfit for a decent human being to inhabit; for many years his wife had been insane and he kept her in his house without any female attendant, and he and she were left, against the advice and, protest of his neighbors and relatives, to the care of a negro man; he was exceedingly forgetful, and could not recall within a few hours business transactions of the simplest character; he could not count money above fifty dollars, but seemed to know the bills. The will was written in the city by the person named as executor, without bond, who had for years managed his money matters, and was witnessed by two of the executor's employees, who were taken to his house for the purpose, and sign-ed by him when none of his relatives or neighbors were present, and the executor gave no testimony of what had occurred between him and the testator concerning its provisions. The will gave one-half his estate to his wife, and out of an estate of over thirty thousand dollars he gave twenty-five hundred dollars to his relatives, and the balance to a charity of which the executor was a trustee, and made no provision whatever for an epileptic nephew who was utterly helpless. Held, that a case was made for the jury to determine whether or not he had sufficient capacity to make a will, and the court erred in directing a verdict sustaining the will.

5. ——: ——: **Disregard of Relationships: Evidence.** It is perfectly proper for a testator, if of sound mind and disposing memory, to disregard the ties of relationship and the needy condition of his relatives; yet such action is a circumstance which the court and jury may consider in determining whether or not he had testamentary capacity.

6. ——: **Undue Influence: Confidential Relation: Presumption: When to be Rebutted: Jury Question.** The executor who wrote the will and took it to the testator to be executed, along with the witnesses who were his employees, had for at least two years loaned the childless testator's funds and otherwise managed his affairs, and was the agent and trustee for a charity organization to which the will, after devising one-half of the estate to his insane wife, gave the bulk of the balance. The testator was an exceedingly feeble old man, mentally and physically, and by the will relieved the executor of the necessity of giving bond, and authorized him to sell the real estate. The executor had written at least three wills for the testator; and when, on a former occasion, the testator's nephew died, leaving a considerable estate, the testator desired the same executor to

be administrator of that estate, although he said he knew he would not give a bond. *Held*, first, that the executor stood in the relation of confidential friend and adviser to the testator; second, the evidence was sufficient to shift the burden and require the executor to rebut the presumption of undue influence; third, the fact that the bequest was to a charitable association instead of to the executor or relative of his, did not relieve him of the duty of rebutting the presumption of undue influence; fourth, undue influence need not be shown by direct evidence, but may be inferred from facts and circumstances; and, fifth, under the circumstances, it was for the jury to say whether or not the will was the result of the undue influence on the part of the executor over the testator.

7. ———: ———: ———: **For Benefit of Another.** Bequests obtained by a charitable association through the undue influence of the executor who was also the scrivener of the will and who held a confidential relation with the testator, cannot be held by it, although there was no personal interference on the part of its officers in bringing about the gift.

8. ———: **Competent Witness: Husband of Heir.** In an action brought by the nieces of the intestate and their husbands to set aside a will, the husbands of such nieces are competent witnesses for plaintiffs. The question at issue is whether or not the deceased left a will, and as there is no presumption that he did, it devolves upon the defendants to establish that fact, and until that fact is established the inchoate right to curtesy of the husbands of the testator's nieces in the lands of their wives prima facie attaches, and they have marital interests which can only be defeated by the establishment of the will. They are, therefore, competent to testify as parties to the action. [Distinguishing Steffen v. Bauer, 70 Mo. 405, and Wood v. Broadley, 76 Mo. 23.]

Appeal from Buchanan Circuit Court.—*Hon. W. K. James,* Judge.

Reversed and remanded.

*W. E. Sherwood* and *C. F. Strop* for appellants.

(1) Insanity is shown by proof of acts and conduct inconsistent with the character and previous habits of the party. McCurry v. Hooper, 12 Ala. 823. (2) Senile dementia is a distinctive form of insanity which in-

capacitates the party to such an extent as to destroy his capacity to make a will. This mental disease is one well recognized by all of the medical authorities and has been recognized by the Supreme Court of this State and by the courts of last resort in sister States. Bever v. Spangler, 61 N. W. 1072; App. of Ulmer, 12 Atl. 686; Kelly v. Gephart, 79 S. W. 420. (3) Mental incapacity to an extent to invalidate a will may be shown by taking into consideration the testator's physical condition, his age, the nature of the will and disposition of his property and the surrounding facts and circumstances. It is not necessary that insanity actually exist. It is sufficient if, upon the whole case made, the evidence tends to show lack of testamentary capacity. Chappell v. Trent, 19 S. E. 304. The above is a leading case which discusses thoroughly the general rule of testamentary capacity. See also: In re Shaw's Will, 2 Redfield, 107; App. of Richmond, 22 Atl. 82; McDaniel v. Crosbey, 19 Ark. 533; Harvey v. Anderson, 12 Ga. 76; Prentis v. Bates, 53 N. W. 153; Will of Mary Ames, 2 N. W. 408. (4) The statute in relation to will contests is *in pari materia* with the statutes governing ordinary trials, and if there is any testimony, either upon the question of mental incapacity, or upon the question of undue influence, the case should be submitted to the jury. State ex rel. v. Guinotte, 156 Mo. 520; Young v. Ridenbaugh, 67 Mo. 574; Appleby v. Brock, 76 Mo. 314. (5) The burden is upon proponents to establish the sanity of testator, nor is the burden shifted by the introduction of the testimony of the attesting witnesses. The attesting witnesses make a prima facie case, but when there is any evidence of insanity, or lack of capacity or undue influence, the burden of proof remains with the proponents throughout the case and it is not shifted. Jones v. Roberts, 37 Mo. App. 172; Elliott v. Welby, 13 Mo. App. 28; Benoist v. Murrin, 58 Mo. 322; Norton v. Paxton, 110 Mo. 456; Karl v. Gamble, 120 Mo. 297. (6) When the scrivener is the principal benefic-

iary the law exacts strict proof of the capacity of testa-
tor, and also that the testator was not unduly influenced
and that the will was the free and voluntary act of tes-
tator. Harvey v. Sullins, 46 Mo. 152; Woods v. Devers,
19 S. W. 1; Patton v. Allison, 26 Tenn. 320. (7) Tes-
tator in this case by a will, written by the trustee of
the principal beneficiary, devised and bequeathed prac-
tically one-half of his estate to strangers. The other
half, under the law, he could not devise or bequeath
because it belonged to the widow. Therefore, testator
left all of his estate which he had a right to control by
will to strangers. This fact is a very strong circum-
stance against the will and when coupled with old age
and even a slight showing as to mental incapacity, casts
upon proponents the burden of rebutting a presump-
tion of undue influence. Caldwell v. Anderson, 104 Pa.
St. 199; Will of Mary Ames, 2 N. W. 408; Renn v. Sa-
mos, 33 Tex. 760. (8) The fact that testator had been
during his entire life on intimate terms with his rela-
tives and heirs-at-law and that the will was not in ac-
cordance with the testator's past life and violated the
Statute of Descents and Distribution and was unjust to
his natural heirs, raises a strong suspicion of undue in-
fluence, which is sufficient to cast upon proponents the
burden of showing that the will was the voluntary
act of testator and was not procured by undue influence.
In re Budlong's Will, 27 N. W. 925; Sims v. Russell,
57 N. W. 601; Gay v. Gillilan, 92 Mo. 250. (9) Where
the principal beneficiary is the confidential friend and
advisor of testator, the law exacts strict proof as to the
mental capacity of testator, and also a direct showing
that no undue influence was used. Jones v. Roberts, 37
Mo. App. 163; Woods v. Devers, 1 S. W. 1; Lane v.
Moore, 23 N. W. 828; Garvin, Admr. v. Williams, 44
Mo. 465; Tibbe v. Kemp, 154 Mo. 580; Bradshaw v.
Yates, 67 Mo. 221. (10) When a confidential relation-
ship is shown between the principal beneficiary and tes-
tator, and when the testator leaves all of his estate

which he has a right to dispose of to strangers, and when the scrivener was the confidential friend in the lifetime of the testator and receives the principal bequests or legacies, and when, as in this case, the will gives such scrivener absolute power of settlement of the estate without even the supervision of the court, it would seem that the concurrence of all these facts presents a case where constructive fraud and undue influence will be presumed, and a case which requires the strictest proof, both as to testamentary capacity and as to the absence of undue influence, and as to the fact that the testator had disinterested advice in the preparation of his will. Caldwell v. Anderson, 104 Pa. St. 199; Renn v. Samos, 33 Tex. 760. (11) Even though the evidence might not be conclusive or even entirely satisfactory or sufficient upon the question of lack of capacity, and even though the evidence might not be conclusive or entirely satisfactory on the question of undue influence or constructive fraud, yet it is certain that if there was any lack of testamentary capacity the opportunity for undue influence would increase in proportion to the degree of lack of capacity, and, therefore, where there is evidence, even though slight, upon both of these propositions, the proponents then have cast upon themselves the burden of making a clear showing, both as to capacity of testator and the absence of undue influence. McDaniel v. Crosby, 19 Ark. 533; Will of Mary Ames, 2 N. W. 408; Meyers v. Hauber, 98 Mo. 438; Caldwell v. Anderson, 104 Pa. St. 199; Renn v. Samos, 33 Tex. 760; Smith v. Smith, 19 N. W. 47; Appeal of Cuthbertson, 97 Pa. 163. (12) The rule is well settled that wherever the relation of confidence and trust exists, and the scrivener and confidential friend is in a position where his influence might operate unduly in favor of the charitable association of which he is a director, the charitable association claiming under the will has cast upon it the full burden of showing the absence of undue influence, and the fact that the testator had disinterested

advice. This is the rule adopted in this State with reference to deeds, and also wills. Garvin, Admr., v. Williams, 44 Mo. 465; Rankin v. Patton, 65 Mo. 415; Yosti v. Loughran, 49 Mo. 599; Tibbe v. Kemp, 154 Mo. 580; In re Blaire's Will, 16 N. Y. Supp. 874; Dingman v. Romine, 141 Mo. 466; Caspri v. Church, 12 Mo. App. 293; Brigwell v. Swank, 84 Mo. 455; Ford v. Hennessey, 70 Mo. 580; Carl v. Gamble, 120 Mo. 297; Barkley v. Cemetery Assn., 153 Mo. 300. (13)    Where the evidence tends to show that testator was suffering from mental weakness as a result of old age, or from insanity which was not produced by some sudden cause, but as the result of a chronic state of the brain; if this condition of the mind is shown to have existed before and after the time of the execution of the will, it is unnecessary to show the condition at the exact time the will was made, for the reason that the law will presume, in the absence of clear evidence to the contrary, that the same mental condition continued, and the same causes which produced lack of mental capacity still operated. Giles v. Hodge, 43 N. W. 163; Daily v. Casteel, 56 Wis. 444; Smith v. Smith, 60 Wis. 326; Von de Veld v. Judy, 143 Mo. 365; In re Bull's Will, 19 N. W. 503; Bever v. Spangler, 61 N. W. 1072.

*H. K. White, T. J. Porter* and *A. W. Brewster* for respondents.

(1) In consideration of this case the court will exclude evidence improperly admitted which includes all the evidence of Messrs. Gage, Roberts and Riley, husbands of the female plaintiffs. R. S. 1899, sec. 4390; Wood v. Broadley, 76 Mo. 33. (2)    When the proponents made a prima facie case by examination of the attesting witnesses and introduction of the will in evidence the burden of proof to sustain intestacy devolved upon contestants and remained there till the close of the case, and unless substantial evidence sustaining the two

charges against the will was introduced, the peremptory instructions given were correct. Crowson v. Crowson, 172 Mo. 691; Riggin v. Westminster College, 160 Mo. 570.   (3)  With the presumption in favor of testamentary capacity, there was no substantial evidence of want of testamentary capacity at the time of making the will which justified the court in allowing the case to go to the jury on that issue.  Sehr v. Lindeman, 153 Mo. 203; Campbell v. Carlisle, 162 Mo. 634; Maddox v. Maddox, 114 Mo. 46; Von de Veld v. Judy, 143 Mo. 367; Southworth v. Southworth, 143 Mo. 59; Crowson v. Crowson, 172 Mo. 691; Crossan v. Crossan, 169 Mo. 161; Benoist v. Murrin, 58 Mo. 307; Cutler v. Zollinger, 117 Mo. 101; Farmer v. Farmer, 129 Mo. 538; Hamon v. Hamon, 79 S. W. 422; Catholic University v. O'Brien, 79 S. W. 901.   (4)  There was no substantial evidence of undue influence in the procurement of the will, and the court did not err in giving a peremptory instruction on that branch of the case.  The proof failed to show any confidential relations between Bartlett and Howell, and there is no presumption of undue influence arising from the preparation of the will while acting as trustee of the Hoagland Endowment Fund.  Studebaker v. Cofield, 159 Mo. 612; Campbell v. Carlisle, 162 Mo. 634; Myers v. Hauger, 98 Mo. 433; Tibbe v. Kamp, 154 Mo. 545; Berberet v. Berberet, 131 Mo. 411; Schouler on Wills (2 Ed.), p. 227; 27 Am. and Eng. Ency. Law (1 Ed.), 495; 8 Cyclopedia of Law and Procedure, title "Confidential Relations;" Bodwell v. Swank, 84 Mo. 455; Roberts v. Hope, 57 Cal. 496; Barkley v. Cemetery Association, 153 Mo. 316; Maddox v. Maddox, 114 Mo. 47; Hegney v. Head, 126 Mo. 619; Aylward v. Briggs, 145 Mo. 604; McFadin v. Catron, 138 Mo. 629; Brown v. Mercantile Trust Co., 4 Atl. 256.

GANTT, J.—This is an appeal from the circuit court of Buchanan county confirming the last will and testament of John B. Howell late of said county. The

contestants are the heirs at law of the said John B. Howell, deceased. John B. Howell at the date of his death on the 7th of January, 1902, was eighty-five years old. He left no children or other descendants, nor any brothers or sisters, nor any heirs excepting the children of his two half-brothers, who are the plaintiffs· in this case. By the will in contest here he devised one-half of the remainder of his estate after the payment of his debts and funeral expenses to his wife Elizabeth Howell in lieu of dower. To Stephen Howell, his brother's son, he bequeathed one thousand dollars; to Norman Buxton, his wife's nephew, five hundred dollars; to Tillie Sage, a half-brother's daughter, five hundred dollars; to Bettie Riley, his half-brother's daughter, two hundred and fifty dollars; to Rebecca Roberts, his half-brother's daughter, two hundred and fifty dollars; and to his friend Nicholas Chambers, one hundred and fifty dollars; and to Catherine Hughes and Joseph Crosswhite, friends of his, each one hundred and fifty dollars. He then gave the residue of his estate to the Ladies' Benevolent Association, to be added to the Hoagland Endowment Fund, to be used as that fund is used for the benefit of the Old Peoples' Home. He appointed Herschel Bartlett and David L. Bartlett, or the survivor or survivors of them, or those of which ever of them should be willing to serve, as executors, and requested that no bond be required of them. The will was executed on the 21st of September, 1901. This will was admitted to probate on the 10th of January, 1902. This action to contest the said will was commenced on the 29th of January, 1902, and under the instructions of the court, the jury returned the verdict that the said paper writing was the last will and testament of John B. Howell, deceased.

On the trial the defendants introduced the two subscribing witnesses, William E. Graves and Leon Atwater who testified to the mental capacity of the testator, and then rested.

It appears on the face of the instrument that the said testator made two efforts to sign his name. The first time, he made a signal failure of spelling "Howell." One of the subscribing witnesses accounted for a large black line which runs through this signature, by saying it was drawn there to enable the old gentleman to sign his name above it. The witness was in doubt as to whether the old man discovered he had left out some of the letters of his name or whether Herschel Bartlett called his attention to it. He is certain Bartlett spoke about it. Both signatures indicate extreme feebleness in the writer. The will was executed at the residence of the testator. The witnesses were both employees of Herschel Bartlett. They were taken out to the testator's house by Herschel Bartlett. None of the testator's relatives or neighbors were present at the execution of the will. It had been prepared by Herschel Bartlett at his office before going out to have the old gentleman sign it. Neither of the subscribing witnesses had ever met the testator in any manner except to see him on three or four occasions at Bartlett's office, or when they went on a former occasion to witness his will. The old gentleman had nothing to do with their selection as witnesses. Mr. Atwater testified he thought the testator knew him from the fact that Mr. Bartlett said to him, "I guess you remember Mr. Graves and Mr. Atwater," and he responded, "How do you do, gentlemen?" Some eight months prior to this they had gone out on a similar mission and Bartlett had introduced them, but the old gentleman had given no indication that he recognized them otherwise. The will was read to him by Herschel Bartlett and once or twice he requested to have a clause read over a second time. It appears that within two years the old gentleman had executed two other wills, all drawn by Herschel Bartlett and attested each time by his two clerks. The circumstances under which Bartlett drew this will, and the di-

rections, if any, given him by the old gentleman, are nowhere disclosed, Bartlett not having testified.

It is and was admitted in the pleadings that Herschel Bartlett was named as executor in said will and that he qualified as such and was in charge of the estate of John B. Howell at the date of the trial; that he is one of the trustees of the Hoagland Endowment Fund, and that the said fund is vested in trustees, the income of which is to be paid over to the Ladies' Union Benevolent Association to be used for the support and maintenance of infirm and indigent old people, men and women, residents of Buchanan county, Missouri. It also appears that Bartlett Brothers handled the old gentleman's money and invested it for him. The testimony tended to show a close confidential relation between the old gentleman and the Bartlett firm, and he made them executors without bond.

Thereupon the plaintiffs introduced evidence showing that they were the natural heirs of the said John B. Howell, deceased, according to the Statute of Descents and Distribution in this State, and that John B. Howell, up to a period of about fifteen years before he died, had been a man of good health and strong physique, of strong mental powers and a successful business man, and had amassed a fortune of from thirty to fifty thousand dollars; he was very neat, tidy and a good dresser, and had always provided for himself and those about him liberally and bountifully; that he had been affectionate and kind towards his various relatives, especially the plaintiffs herein, who were the daughters of his half-brother; that Henry Landrum, a son of his half-brother, who was at the time of the execution of said will, and had been for many years prior thereto, an epileptic, and unable to care for himself, entirely destitute, and an object of charity among his relatives, was omitted from and not mentioned in any provision of said will. Plaintiff's evidence further tended to prove that they were people in the humbler

walks of life, without any property excepting, perhaps, the household effects of their respective families, but that they were all respectable and industrious citizens for whom John B. Howell, the testator, had always evinced much affection and had always visited with them and frequently entertained them, and had shown them much kindness. Plaintiffs' evidence tended also to show that some fifteen years before his death, the said testator commenced to fail physically and mentally, but the change was not marked until about four years before his death, at which time his decline became noticeable and rapid. There was evidence that about three years before the death of said Howell, he began, and at intervals which became more frequent during the last year of his life, to have delusions, illusions and hallucinations. Testimony of the plaintiffs tended to show that for a year prior to his death said Howell suffered from a distinctive form of insanity known as senile dementia. The two physicians attending at the time of his death gave their opinion, in view of the condition that he was in just prior to and at the time of his death, that this dementia had existed for at least a year. Testimony tended to show that this disease is progressive and downward, that it tends to produce delusions and illusions in general, and incapacitating one from transacting business, and causing the patient to become suspicious of those about him and frequently causing a change in the methods and habits of life, and bringing about frequently a total disregard of personal cleanliness and indifference to the ordinary demands in the way of food and clothing. The testimony tended to show that for a number of years prior to his death, a nephew of his, Levin Howell, who had lived with him, and looked after his affairs, died the March preceding the death of John Howell, the testator; that during the last year of his life, the testator imagined that negroes were in the house for the purpose of annoying him and his wife, and that soldiers were quartered in his

home, and he frequently complained that the government ought not to permit him to be annoyed with soldiers in his home. At other times he imagined that his wife, who was insane and had been for many years, was stealing from him; he also believed that other relatives were stealing from him. He had imaginary conflicts with persons in his room, and believed that he was killing people. After the death of his nephew, Levin, he imagined that Levin had visited him during the night and conversed with him. During the month of August, immediately preceding the time of the execution of the alleged will in September, he became very ill and for about three weeks was in a critical condition. The testimony was that for a year preceding his death he could only move around his room by supporting himself on chairs and other objects, and had lost the control of his arms and hands in a large degree; that he had no coherence of thought; that he would start to tell some story or reminiscence which he would never complete, but would commence over again and again forgetting the conclusion of the story and the fact that he had told a part of it; that frequently when his friends and relatives visited him, while they were talking to him he would doze into unconsciousness and was aroused with difficulty. Dr. Woodson, superintendent of the insane asylum at St. Joseph, an expert on mental diseases, in answer to a hypothetical question based upon the foregoing facts and various others of a similar character, gave it as his opinion that Mr. Howell was insane at the time of his death, and for a long period prior thereto, including the date of the making of the will in question. The testimony of the plaintiff tended to show that for months prior to his death the testator's house was in a woful condition of filth, and that his insane wife was kept there without care of any competent servant, and that when his relatives insisted on his having competent help, he would say he was willing to pay a dollar a week, and when told that he could not obtain help at

such a price, he would say that was enough; that he and his wife were left largely to the care of a negro man.

On the part of the defendants, however, it was insisted, notwithstanding the foregoing evidence, that Mr. Howell had sufficient mental capacity to make a will, and they point to the fact that when Levin Howell died at the residence of the testator, he had on his person at the time of his death $3,613, which the old gentleman directed to be deposited in his own name before Levin was buried. Another fact was that while Levin was a corpse, a Mrs. Christopher came to rent one of the houses belonging to the testator, but he did not want to rent it to a widow, but Mrs. Riley, one of the plaintiffs, knew her and vouched for her, and he let her have the house. Mrs. Christopher paid the testator five dollars on account of the rent in advance and agreed to pay thereafter the rent, weekly, for that month, and after that a month's rent in advance. Mr. Howell put the bill in his pocket, and later, on the same day, when Buxton wanted some money to pay for digging Levin's grave, he had forgotten where he got the money; he was much distressed over Levin's death. After Levin's funeral, in expectation of Stephen Howell coming from Montana, Mr. Howell had the house cleaned and papered, this paper the old gentleman showed to Mrs. Riley in the summer of 1901. Stephen Howell, Levin Howell's brother, came to St. Joseph in June, 1901; he had not seen him for over twenty years, found him very forgetful and physically weak. He slept in the same room with his uncle at first, but as it began to get hotter he slept out on the porch. The old man was in a very restless condition, and during the night would imagine persons were there who were not there, and sometimes these imaginings took place in the daytime. While Stephen was there the question of administration of Levin's estate came up, and the old gentleman wanted William Bartlett to administer on it. After Le-

vin's death, Mrs. Howell's nephew, Buxton, attended to collecting the rents, and Herschel Bartlett attended to his other business. William Bartlett did not want to give a bond to administer on Levin's estate, and when Cobb was appointed administrator, the old gentleman asked to have William Bartlett sent up to be present while the inventory was being made. While the inventory was being made of Levin's estate, the old gentleman directed Buxton, his wife's nephew, what property to bring out to show the witnesses and spoke of the deposit of Levin's money in March, and said Levin had a piece of real estate in St. Joseph. Major Garth, who was one of the witnesses to the appraisement, testified that the old gentleman was dressed in his night clothes at the time they made the appraisement; they got very little information out of him; he was very weak and feeble in body; he had some mind, but not as good as it had been. "I considered him unsound; he was certainly partially unsound." Mr. Landers had business dealings with the old man in 1897 and 1899 about building and rebuilding a barn, and in both cases the old gentleman had difficulty in counting money; he could not count over fifty consecutively, although he knew the bills.

At the conclusion of the evidence by the contestants, the proponents of the will introduced no other testimony but prayed the court to give the following instructions, which were given:

"1. The court instructs the jury that there is no substantial evidence in this case that John B. Howell was not of sound mind at the time of the execution of the instrument propounded as his will dated September 21, 1901, and as to that issue they are bound to find in favor of the will.

"2. The jury are further instructed that there is no substantial evidence in this case showing or tending to show that the instrument here propounded as the last will and testament of John B. Howell, deceased, dated

September 21, 1901, was obtained by undue influence exerted over the said John B. Howell, and as to that issue they are bound to find in favor of the will.

"3. Under the pleadings and evidence in this case the jury are bound to find that the paper here propounded and offered as the last will and testament of John B. Howell, dated September 21, 1901, was and is his last will and testament, and they will make their verdict in the following form: 'We, the jury, find that the instrument here propounded, dated September 21, 1901, is the last will and testament of John B. Howell, deceased.' "

To the action of the court in giving these instructions, the plaintiffs at the time duly excepted, and afterwards and within four days, filed motion for new trial, which was heard and overruled and exceptions saved thereto, and an appeal is prayed and granted to this court.

I. The controlling points on this appeal are whether there was substantial evidence as to the incapacity of John B. Howell to make a last will and testament to require that issue to be submitted to the jury, and whether there was sufficient evidence of a fiduciary relation between John B. Howell and Herschel Bartlett to require the said Bartlett to overcome the presumption that said will was obtained by the exercise of undue influence in the circumstances of the case.

The rule of practice is well settled in this State, that a will contest is an action at law, and this court will not reverse the judgment because the jury found against the weight of the evidence, but that this court will examine the record to see if there is any testimony to support the finding, and where there is no evidence whereon to base the verdict, the judgment will be reversed. [State ex rel. v. Guinotte, 156 Mo. 1. c. 520, 521; McFadin v. Catron, 138 Mo. 227.]

Proceeding, then, to an investigation as to the quantum of evidence adduced by the plaintiffs to show

that John B. Howell by reason of his extreme age and disease had not sufficient capacity to make a will, in general, testamentary capacity has been defined by this court on various occasions to be that the testator at the time of the execution of his will should have sufficient understanding and intelligence to transact his ordinary busines affairs and to understand the nature and character of his property and the persons to whom he was giving it.

[Farmer v. Farmer, 129 Mo. 534; Brinkman v. Rueggesick, 71 Mo. 553.]

And it has been often said that a man may be capable of making a will and yet incapable of making a contract or managing an estate. [Hamon v. Hamon, 180 Mo. 685.]

Accepting this as a proper rule for our guidance in the examination of the evidence in this record, we find the facts to be that John B. Howell, at the time of the execution of the will in contest, was a man eighty-five years of age, and very feeble from old age and disease. In his younger manhood, he was a man of vigorous constitution and mentally strong and had a most successful business career, and by his own efforts largely had amassed a fortune of over thirty thousand dollars; he had been scrupulously neat, tidy and cleanly in his dress and person, and had been a liberal provider for his household, affectionate and kind to his relatives, the plaintiffs in this case, who were the children of his half-brothers. Between him and his relatives there had existed the best of feeling and no cause of estrangement or dissatisfaction between them and him appears afterward in the evidence. These nephews and nieces appeared to have all been respectable, industrious and reputable citizens; he visited them and they frequently visited him and were entertained by him. The evidence tends to show that about fifteen years before his death, or when about seventy years of age, the testator began to fail both physically and men-

tally, but his breaking down was slow and did not become marked until about four years before his death when his 'decline became rapid, that about this time he began to have many delusions and hallucinations which were utterly groundless, and in the last year of his life during which he executed the will in contest, the medical testimony tended to prove that he was suffering from senile dementia, and that the effect of this disease was to incapacitate him from transacting his ordinary business and to cause him to be suspicious of those about him, for whom previously to that time he had held a high regard, and causing a complete change in the methods and habits of his life; that whereas formerly he had been tidy and dressy he became not only slovenly, but absolutely filthy in his person, and that his home was unfit for a decent human being to inhabit; that he seemed utterly oblivious to his personal condition and that of his home; that for many years his wife had been insane, and that he continued to keep her in his house without any female attendant to look after and to attend to her wants; that when his relatives and neighbors would suggest to him the necessity of providing some competent help for himself and his wife and to keep his home clean, he would say that he was willing to get a woman if she would stay for one dollar per week, and that that was enough, and thus both he and his wife were left to the care of a negro man. He ceased to provide himself with any proper clothing and at the time of the execution of the will the evidence tends to show that he was dressed in his night clothes which were of the coarsest kind and in no manner suitable to a man of his wealth, or at all in keeping with his former tidy and dressy habits. While it is urged by respondents that the cross-examination of plaintiffs' witnesses tended to show that he had capacity to attend to his ordinary business, the great weight of the evidence indicated that he had little or nothing to do with the management of his affairs. His money mat-

ters seemed to have been left to the care of Bartlett Brothers who invested and looked after his financial matters of importance. Prior to the death of his nephew, Levin Howell, that nephew looked after the household expenditures and smaller domestic matters. After he died, one Buxton, a nephew of his wife, succeeded Levin in looking after the home, but how well the Bartletts or Buxton managed his affairs there was no evidence in the case, and whether the testator understood enough to determine whether they were or were not faithful was not shown in the case. That he was exceedingly forgetful and could not recall within a few hours business transactions of the simplest character, was shown by the evidence of the plaintiffs. It was shown by Mr. Landers, who rented his farm in Andrew county, that the old gentleman was incapable of counting money above fifty dollars, that he would seem to know the bills, and when he attempted to pay Landers about one hundred dollars for replacing a barn that was burned on his farm he could not count that much money, but was compelled, after various efforts, to leave it to Mr. Landers to count it out for him. At the time of the execution of his will none of his relatives or near neighbors were present, or had any conversation with him about it, and Herschel Bartlett, who wrote the will, gave no testimony as to what occurred between him and the testator in the way of directing the provisions of his will. The two subscribing witnesses had the very slightest acquaintance with the testator, and their own testimony discloses little or no opportunity to judge of his mentality. In view of all this evidence of extreme debility from old age, and of the radical change that had taken place in the testator, as testified to by those who had known him in his vigorous manhood and successful career as a merchant, coupled with the evidence of his utter disregard of the laws of cleanliness and health, his incapacity to realize the needs of his helpless and insane wife, leaving her

to the care of a negro man, his refusal to provide her a
female attendant and servant to look after her in her
helpless condition, and his suspicion that his wife was
stealing from him, in our opinion a case was made
which should have been submitted to a jury to deter-
mine whether the testator, Mr. Howell, had sufficient
mental capacity to make a will. We think it is clear
that there was no such concurrence of testimony in
favor of his capacity to attend to ordinary business
affairs and to know the nature and amount of his es-
tate and to whom he was giving it, as to justify the cir-
cuit court in declaring as a matter of law that he was
capable of making a will. When it is considered that
out of an estate of over thirty thousand dollars he gave
his own blood relatives, kinspeople for whom he had
always shown a natural affection and regard, only
twenty-five hundred dollars, and that he made absolute-
ly no provision for Henry Landrum, a nephew, who
was an epileptic and utterly helpless and an object of
charity, it will be hard to say as a matter of law that
he had a mind and memory capable of regarding and
discriminating as to those who were the natural objects
of his bounty and bound to him by the obligations of
family and blood. While it was perfectly competent
for him, if of sound mind and disposing memory, to
disregard these ties of relationship, it is a circumstance
which the jury and the courts will take into considera-
tion in determining whether as a matter of fact he had
that capacity and understanding which the law re-
quires to make a valid will, as already indicated in this
opinion. Our conclusion on this point is that the cir-
cuit court erred in taking the case from the jury and
not submitting this question, under proper instructions,
to them to determine that fact.

II. Addressing ourselves now to the charge that
the will in contest was the result of undue influence over
the testator by Herschel Bartlett, agent and trustee

for the Hoagland Endowment Fund, it appeared in evidence and the admissions in the pleadings that Herschel Bartlett was, prior to and at the date of the execution of the will, one of the trustees of the Hoagland Endowment Fund. By the will in contest the fund given by the testator to the Ladies' Union Benevolent Association was ''to be added to the Hoagland Endowment Fund to be used as that fund is.'' That the firm of Bartlett Brothers, of which Herschel Bartlett was a member, were loan agents and invested the testator's funds for him, is conceded; that they had in fact his unlimited confidence, appears from the fact that he expressly exempted them from giving a bond for the execution of his will of which he had made them executors. It was shown also that Herschel Bartlett had drawn at least three wills for him. When Levin Howell died, the old gentleman desired the Bartletts, or one of them, to administer on the estate, although he said he knew that they would not give a bond and insisted on William Bartlett coming to his house when the inventory was made. At this time the evidence tended strongly to show that John B. Howell was of extreme old age and of greatly impaired intellect from what he had formerly been. That Herschel Bartlett was his agent in his important financial matters and stood in the relation of a confidential friend and adviser, there can be little doubt. For at least two years this relation had existed. The circuit court held there was no evidence that the will in contest was obtained by undue influence over said testator. The question presented is whether upon the case made by plaintiffs, the defendants were not required to rebut the presumption of undue influence. Conceding there was no direct evidence of undue influence, does it follow that there was not enough to permit the plaintiffs to go to the jury?

It is well-settled law in this State that undue influence need not be shown by direct proof, but may be inferred from facts and circumstances. [1 Woerner,

Law of Administration, sec. 32; Garvin's Admr. v. Williams, 44 Mo. 465; Carl v. Gabel, 120 Mo. l. c. 297; Bradford v. Blossom, 190 Mo. 110; Dausman v. Rankin, 189 Mo. 677.] It may be shown by the relation of the parties, the mental condition of the person whose act is in question, and the character of the transaction. In Myers v. Hauger, 98 Mo. l. c. 438, it was said: "In determining whether a will is the result of undue influence, it is proper to consider the mental condition of the person upon whom the influence is alleged to have been exerted. And, as the physical condition has much to do with the mental, the physical condition of the testator may also be considered. So the will itself may be read to the jury, for they must determine the question of undue influence in the light of all the circumstances. The result may be considered in endeavoring to find the cause." This statement of the law was approved in Bradford v. Blossom, supra.

In Gay v. Gillilan, 92 Mo. l. c. 263, it is said: "While it is true that undue influence will not be presumed, yet, when such facts are proved as will authorize a jury to find the existence of undue influence, then the burden shifts, and it then devolves upon the party charged to exonerate himself from such charge, in like manner as in the case of fiduciary or confidential relations." [Maddox v. Maddox, 114 Mo. 35.]

With these principles established and taking into view the extreme old age of John B. Howell, the testator, his extreme debility from old age and illness, the mental condition testified to by various witnesses for the plaintiffs, the trust relation existing between him and the executor Herschel Bartlett, the great confidence which he was shown to have reposed in the Bartlett firm, the fact that out of an estate of thirty thousand dollars he gave his own relatives with whom he had been on terms of affection, only twenty-five hundred dollars; that he entirely omitted from the list of his

donees his nephew, Henry Landrum, who was an epileptic and an object of charity, the fact that he gave the great bulk of his fortune to the Ladies' Union Benevolent Association to be added to the Hoagland Endowment Fund, and to be expended and used as the latter fund was used, and that Herschel Bartlett was a trustee of the Hoagland Endowment Fund, and when in addition to this it is considered that he gave this executor power to sell all of his real estate for such prices and on such terms as might seem proper to his executor, and that this executor was relieved of all obligation to give a bond for the faithful discharge of his trust, we think there was evidence sufficient to shift the burden and require the executor, Bartlett, who was also the scrivener of this will, to rebut the presumption of undue influence, and it matters not that the bequest was to a charitable association instead of to the scrivener or relative of his.

The case of Barkley v. Cemetery Association, 153 Mo. 300, does not conflict with the conclusion we have reached on this point. In that case we held that the proof did not show a confidential relationship, but we said: "We recognize the well-settled rule which indulges the presumption that undue influence has been used, where close, confidential or fiduciary relationships exist. This rule has for its basis some pecuniary benefit to be derived by the charity represented by the person by whose influence the testator is influenced to make the will." In this case, we think the evidence sufficient to authorize the jury to find that a confidential or fiduciary relation existed between the testator and Herschel Bartlett, and that the peculiar language of the will made the legacy as available to the Hoagland Endowment Fund, of which Herschel Bartlett was a trustee, as if it had been given in express terms directly to said fund.

As to the suggestion that no officer of the Ladies' Union Benevolent Association exerted any undue influ-

ence to bring about the valuable legacy bequeathed by this will to said association, the remarks of WILMOT, C. J., in Bridgman v. Green, 2 Ves. Sr. 627 (Wilm. 64), are apropos. In that case he said: "There is no pretence that Green's brother or his wife was a party to any imposition, or had any due or undue influence over the plaintiff; but does it follow from thence that they must keep the money? No. Whoever receives it must take it tainted and infected with undue influence and imposition of the person procuring the gift; his partitioning and cantoning it out amongst his relatives and friends will not purify the gift, and protect it against the equity of the person imposed upon. Let the hand receiving it be ever so chaste, yet if it comes through a polluted channel, the obligation of restitution will follow it." In Huguenin v. Baseley, 14 Ves. Ch. 289, the same principle was approved, and it was held that interest so gained by third persons cannot be held by them, although there was no personal interference on their part in bringing about the gift by undue influence.

Without further elaboration on this point it must suffice to say that the circuit court erred in giving the second instruction in behalf of the defendant, and should have submitted the question of undue influence to the jury under proper instructions.

III. The remaining question is whether the husbands of Mrs. Rebecca Roberts, Mrs. Sage and Mrs. Riley were competent witnesses. As this cause must be tried again it is proper that their admissibility should be determined at this time. On the part of the defendants it is insisted that these husbands of the nieces of John B. Howell, the testator, were incompetent to testify, because they had no material interest in the estate of John B. Howell, and that they were unnecessary parties to the suit and were made so over the objection of the defendants.

This contention is based upon the decision of this

court in Wood v. Broadley, 76 Mo. 23. That was a suit by a daughter to set aside a deed by her father to his second wife, and the husband of the daughter was tendered as a witness in behalf of his wife and was rejected by the circuit court, and the decision of the circuit court was affirmed by this court on the ground that his wife had never been seized of the real estate conveyed by her father to her stepmother, and therefore the husband could have no interest in the said lands as tenant by the curtesy initiate of land of which his wife was never seized, and the decision was distinguishable from the previous case of Steffen v. Bauer, 70 Mo. 405, in which it was ruled in an action by both the husband and the wife to set aside a conveyance made by them of land which had been deeded to the wife, on the ground that it was not acknowledged in compliance with the law, and was signed by the wife under compulsion of her husband, that the husband was a competent witness because, ''he had an interest in the issue as well as his wife, since in the event of her death he would be tenant by curtesy, and also had an interest in his wife's lands during coverture.'' The point is an interesting one, but we think that the husbands of these nieces, the plaintiffs in this case, were properly made plaintiffs in the action, and that as the evidence showed that they each had issue born alive, capable of inheriting, and that when John B. Howell died, prima facie, their wives, the plaintiffs herein, inherited the property of the said John B. Howell in the absence of a will duly executed by the said Howell at a time when he was of sound mind and disposing memory. We think there is no conflict between the decision in Steffen v. Bauer, supra, and Wood v. Broadley, 76 Mo. 23. In the Steffen case the wife had a vested interest before her conveyance and that interest continued if her deed was inoperative on account of a failure to comply with the law in her acknowledgment, or was made by compulsion of her husband, and her husband was tenant by the cur-

tesy initiate.  In that case the court said:  "The plaintiff Steffen was clearly competent to testify as a party in regard to any fact touching his own interest alone, and so the circuit court held, but he was not allowed to testify on an issue which was supposed chiefly to affect his wife's interest. It is obvious that he had an interest in the issue as well as his wife, since in the event of her death he would be tenant by the curtesy, and also had an interest in his wife's lands during coverture." And the court held that the distinction made by the circuit court was too refined to be of practical use and not authorized under our statutes, and that the husband was a competent witness.  In the case at bar the question at issue is whether or not the deceased, John B. Howell, left a will, and as there is no presumption that he did leave a will, it devolves upon the proponents, the defendants in this case, to establish that fact, and until that fact is established, the inchoate right to curtesy in the lands left by John B. Howell, of the husbands of his nieces, prima facie attached, and they have marital interests in the lands of their wives which can only be defeated by the establishment of a last will and testament by John B. Howell which deprived them of any interest in his real estate.  The question resolves itself into one of the burden of proof. As we hold that the burden of establishing that there was a will rested upon the defendants, the husbands were prima facie entitled to marital interests, and therefore were competent witnesses to testify in the case as parties of the action.  [Layson v. Cooper, 174 Mo. 211.]  There was, therefore, no error in permitting them to testify.

For the reasons assigned the judgment of the circuit court must be and is reversed, and the cause remanded to the circuit court of Buchanan county to be tried in accordance with the views herein expressed.

All concur.