OLLIE GOTT, Appellant, v. RACHAEL A. DENNIS
et al.

Division One, December 18, 1922.

1. -UNDUE INFLUENCE: Proof: By Circumstantial Evidence. Proof
by direct evidence of the exercise of undue influence upon a tes-
tator whose will practically disinherited his only child in favor
of his brother, sister and other collateral kindred, is not neces-
sary, but in such case the existence and exercise of undue influence
may be proved by circumstantial evidence and facts from which
it may be inferred.

2. ———: ———: Expressed Intention and Affection for Child. Ex-
pressed affection by testator for his only child, who was practical-
ly disinherited by his will in favor of his collateral kindred, and
an expressed intention to leave his property to her, whether ex-
pressed before or after the execution of his will, standing alone,
do not establish sufficient undue influence to authorize the setting
aside of his will, but they do show his state of mind towards her,
and are competent, and are to be considered along with other evi-
dence and circumstances, on the issue of undue influence.

3. ———: ———: Gross Inequality. Gross inequality in the dis-
tribution of testator's bounty amongst those by law and nature
entitled to share equally therein, standing alone, will not raise a
presumption of undue influence sufficient to invalidate the will,
not even, perhaps, where the will practically disinherits his only
child in favor of his collateral kindred; but such unjust discrimi-
nation does tend to establish undue influence when other facts and
circumstances tending to show such influence are produced.

4. ———: ———: Separation from Wife: Explanation. Testimony
that the testator declared at the time he separated from his wife,
after living with her, at her mother's house, for a single month,
that he "hated to do it," but did it on account of "his family
making him trouble," though, perhaps, not sufficiently definite
and circumstantial to be accepted as *res gestae*, is nevertheless
admissible as tending to show his mental attitude towards his
wife and towards his family, namely, regret to part with her and
subservience to their will.

5. ———: ———: Other Facts and Circumstances: Presumed Continu-
ance. Testimony that when testator married, his mother and

Gott v. Dennis.

three maiden sisters lived with him, and that while he and his brother, who also lived with him, were general partners, he was the head and front of the firm and family and the money-maker; that he married a neighborhood girl and lived with her at her mother's home for a month, and then separated from her and returned to the family, where he continued to reside and accumulate property; that when he separated from her he told her half-brother that he "hated to do it," but did it on account of "his family making him trouble;" that in due course a child was born of the marriage, and he frequently visited his wife and child, treated them with affection and furnished them money for their support, and after they moved seven years later to another part of the State wrote them affectionate letters, sent them money and contributed to their support until the child married at the age of sixteen, together with his expressed intention to leave his property to his child, are facts and circumstances from which the exercise of undue influence upon him by members of his family may be inferred; and such influence being once shown to exist, is presumed to have continued.

6. ———: ———: Separation from Wife: Expressed Desire to Remarry Her: Declarations. In an action to set aside a will by which testator practically disinherited his only child in favor of his brother, sister, nephews and nieces, brought by the child and based on the charge that it was the result of undue influence exercised upon him by his family, testimony by his wife and said child to the effect that, years after he had separated from his wife and she had obtained a divorce, he expressed a wish to remarry her, but his family objected and prevented it, is not competent to prove the truth of such declarations attributed to him; but letters written to them in which he expressed such wish are competent for the purpose of showing his mental state towards his wife and child and towards his family, in that they show that his state of mind continued to be one of affection towards his wife and child and one of subserviency to the will of his family.

7. ———: Presumption and Proof of Continuance: Question for Jury. Where the circumstantial evidence tends to show that the testatory's family exercised such undue influence over him at the very outset of his married life as to cause him to separate from his wife against his will; in order that she and any subsequently born child might be deprived of their lawful rights in his property, that influence, shown to exist at the time of such separation, is presumed to continue, and to be strong enough to explain the practical disinheritance of his only child born of the marriage by his will made many years afterwards; and it is shown to have

continued by evidence that, after such separation, he returned to his family and continued thereafter to reside with and support them and was surrounded by the same influences throughout the remainder of his life; that the wife and child a few years after he separated from her went away to a different part of the State and later to a far distant State; that he was not again married, and never again attempted to leave his family, notwithstanding his affection and solicitude for his deserted wife and child continued ever afterwards; that none of his family visited his wife, and never invited her to visit them, and she was never at the house in which he cared for and supported them, although she lived with her mother only a mile or two away for seven years after his child was born, and he often visited her there and treated her and his child with fond affection; that he never took his child or invited her to his home, except one time four years after her marriage when she was visiting her mother's brother in the neighborhood, although his letters written about the time of her marriage expressed his plan to visit her; and that she was not notified of his last sickness or death by any of the numerous members of his family, although all of them were named as legatees in his will. And this testimony, showing that the same influences which caused him to separate from his wife in 1871 continued to dominate him throughout his life, and the presumption that undue influence once shown to exist continues, are sufficient to require a submission to the jury of the question whether his will made in 1912, by which he bequeathed only five hundred dollars to his only child and devised all the rest of a large estate to his collateral kindred, consisting of his brother, sister, nephews and nieces, was the result of undue influence begun at the time of his marriage and continued up to the time the will was made.

8. ———: Unjust and Unnatural Will: Duty of Court. A grossly unjust and unnatural will imposes upon the court the duty to carefully examine all the facts and circumstances bearing on the issue of undue influence.

9. ———: ———: Unnatural Discrimination Itself Evidence: Burden of Proof. There being other circumstantial evidence of undue influence, gross inequality and unnatural discrimination by the testator against his only child of themselves become evidence of such undue influence, and shift the burden of proof from such contestant to the proponents to show that the will was not the result of such influence, just as the rule shifts the burden of proof in a will contest in which a confidential relation between the testator and the beneficiary is shown.

10. **DECLARATIONS OF TESTATOR**: Isolated and Remote. Isolated verbal declarations of the testator concerning his only child and his intention to provide for her, made many years prior to his death, are generally entitled to but little weight and often do not constitute substantial evidence. But where they cover the whole period of his long life after the birth of the child and constitute one continued and connected story of his mental attitude towards her and her mother, from whom he had separated within a month after his marriage, they are competent, and particularly so where they are confirmed by letters written by him many years after the birth of the child, all showing continued affection for her, praising the mother for her fidelity to her, exculpating the mother from blame and expressing his indebtedness to her for her treatment of him.

11. ———: **Overt Act.** The contestant's right to have her case submitted to the jury cannot be denied on the sole ground that she has failed to show that some overt act of undue influence was exerted upon the testator at the very time his will was made, where such influence was previously acquired and continued operative up to the time he made his will; and that such influence was acquired and so continued may be established by facts and circumstances, and direct testimony is not necessary.

12. ———: **Exercised by Others: Beneficiaries of Evil Influence.** Although some of the beneficiaries to whom was devised the greater part of testator's property had no part in the undue influence which operated to produce the will, the evil influence is imputable to them. Where there is substantial evidence tending to show that the evil influence to deprive testator's wife and any child that might be born to him of their lawful share in his property was begun by his mother, brother, three maiden sisters and other members of his family in 1871 and at the time operated to separate him from his wife and that such evil influence continued down to 1912, his will, made at that time, is infected with the virus of illegality and should be set aside, although the mother and some of the sisters had previously died, and the beneficiaries are his nephews and nieces, and had no immediate part in the act which produced the will practically disinheriting his child.

13. ———: **Statements of Beneficiaries: Inadmissible Against Others.** Statements made by a sister of the testator, who is a beneficiary in his will, and by a deceased sister, to his wife, after his separation from her, to the effect that they would see to it that their brother did not live with her again, and that neither she nor her child (the plaintiff) would ever get any of his property, are in-

admissible against his nephews and nieces who are the principal beneficiaries of his will, made long afterwards and charged to be the product of the evil influences exerted upon him by said sisters and other members of his family.

14. ———: **Declarations and Transactions Before and After Will Was Made.** Where the roots of the undue influence of testator's family permeate his whole life after his marriage in 1871, his acts and declarations up to the time of his death regarding his transactions with the members of his family or any member thereof are admissible in evidence, to show that their previous relations and state of mind towards each other continued to exist. And also the evidence of and facts surrounding the gift of bonds to a sister, made after the will was executed, are admissible, as tending to show why he did not change his will during the years he survived its execution.

15. **INCAPACITY: Unnatural Treatment of Child.** Harsh and unnatural disposition of testator's property, and harsh and unnatural treatment of his wife and only child and his subservience to the will of his mother, brother and sister who influenced him to forsake his wife after a marriage of a month, are circumstances which tend to discredit his testamentary capacity.

Appeal from Saline Circuit Court.—*Hon. Samuel Davis,* Judge.

REVERSED AND REMANDED.

*Ernest D. Martin, Roy D. Williams* and *Robert M. Reynolds* for appellant.

(1) The court erred in giving the peremptory instruction in the nature of a demurrer, at the close of the plaintiff's case, directing a verdict sustaining the will. It was a question for the jury under all the evidence in the record, and the cause should have been submitted to the jury, both as to lack of testamentary capacity and as to undue influence. McFadden v. Catron, 120 Mo. 252; Bradford v. Blossom, 190 Mo. 110; Roberts v. Bartlett, 190 Mo. 680; Meier v. Buchter, 197 Mo. 68; Holton v. Cochrane, 208 Mo. 314; Teckenbrock v. McLaughlin, 209 Mo. 535; Turner v. Anderson, 236 Mo. 523; Naylor v.

Gott v. Dennis.

McRuer, 248 Mo. 423; Wendling v. Bowden, 252 Mo.
647. (2) The proof of undue influence is not neces-
sarily to be made out from direct and positive testi-
mony, but often it must rest as an inference from facts
and circumstances proven and in evidence. Whenever
there is substantial evidence tending to establish undue
influence, whether it be direct testimony or facts and
circumstances from which such influence naturally flows
as its product, the question becomes one for the jury to
determine, and not the court. Maddox v. Maddox, 114
Mo. 35; Bradford v. Blossom, 190 Mo. 110; Meier v.
Buchter, 197 Mo. 168; Teckenbrock v. McLaughlin, 209
Mo. 535; Turner v. Anderson, 236 Mo. 523. (3) Undue
influence may be inferred from certain facts or from a
combination of facts and circumstances. It may be shown
by the relation of the parties, the mental condition of
the testator, the provisions of the will, the character of
the transaction, the interest of the parties charged with
exercising it, or any other facts and circumstances con-
nected with and bearing upon it. The question of undue
influence is always to be determined in the light of all the
circumstances connected with and bearing upon the ex-
ecution of the will, along with the provisions thereof.
Myers v. Haugher, 98 Mo. 433; Maddox v. Maddox, 114
Mo. 35; Dingman v. Romine, 141 Mo. 446; Crausen v.
Crausen, 172 Mo. 691; Bradford v. Blossom, 190 Mo.
119; Meier v. Buchter, 197 Mo. 68. (4) Unnatural and
unfair disposition by a testator of his property to the
exclusion of his own child, or to the practical exclusion
of such child, even though made to other relatives, is at
once regarded with jealousy and suspicion, and at once
compels a searching inquiry, and while such unnatural
disposition may not alone be sufficient to establish un-
due influence, yet if there be other circumstances tend-
ing to show such undue influence, even though slight,
such unnatural and unfair disposition, together with
such other circumstances as may appear, are sufficient
to take the case to the jury. Bradford v. Blossom, 190.

Mo. 119; Meier v. Buchter, 197 Mo. 98; Holton v. Cochran, 208 Mo. 314; Teckenbrock v. McLaughlin, 209 Mo. 533; Turner v. Anderson, 236 Mo. 523; Wendling v. Bowden, 252 Mo. 688. (5) There are ample facts in the record aside from the unnatural and unfair provisions of the will upon which the jury might well find that the will of deceased was a natural result of the undue influence of the defendants over him, and of which no denial is made, and for which no explanation whatever is offered in the record. Such facts, when considered in connection with the provisions of the will, are overwhelming. (6) The court erred in excluding the testimony offered by the plaintiff as to large gifts of property made to certain of the defendants in his lifetime, such gifts tending to show undue influence by such defendants over the deceased in the disposition of his property. Meier v. Buchter, 197 Mo. 68; Holton v. Cochran, 208 Mo. 314.

*Harvey & Bellamy, Alf. F. Rector* and *Lamm, Bohling & Lamm* for respondents.

(1) The court was fully justified in giving the peremptory instruction, in the nature of a demurrer to plaintiff's evidence, establishing the will in controversy. There was no evidence in the entire record that the testator was of unsound mind, nor any substantial evidence of undue influence, nor that any influence or any kind was exercised over testator at the time of making his will. When there is no substantial evidence, either of testamentary incapacity or undue influence, it is the duty of the court to so instruct the jury. Teckenbrock v. McLaughlin, 209 Mo. 533; Campbell v. Carlisle, 162 Mo. 634; Sehr v. Lindeman, 153 Mo. 276; Fulbright v. County, 145 Mo. 432; McFadin v. Catron, 138 Mo. 197; Riley v. Sherwood, 144 Mo. 354; Von de Veld v. Judy, 143 Mo. 348; Berteret, v. Berteret, 131 Mo. 399; Cash v. Lust, 142 Mo. 630; DeFoe v. DeFoe, 144

Mo. 458; Hughes v. Rader, 183 Mo. 630; Jackson v. Hardin, 83 Mo. 185; Brinkman v. Rueggesick, 71 Mo. 553; Tibbe v. Kamp, 154 Mo. 543; Morton v. Paxton, 110 Mo. 456; Myers v. Hanger, 98 Mo. 433; Appleby v. Brock, 76 Mo. 685; Wendling v. Bowden, 252 Mo. 647; Goedecke v. Lindhorst, 278 Mo. 504; Nook v. Zuck, 233 S. W. 238. (2) The evidence on behalf of proponents thoroughly established the fact that testator was of sound mind at the time of the execution of his will. And where such mental condition is shown *aliunde* medical speculations, relating thereto, are entitled to but little weight. Rankin v. Rankin, 61 Mo. 295. The testimony of Dr. Spotts, witness for plaintiff, was mere speculation, to say the least. (3) While undue influence may be shown by facts and circumstances and need not always be proved by direct and positive testimony, yet there must be substantial evidence tending to establish such undue influence. Jackson v. Hardin, 83 Mo. 185; Tibbe v. Kamp, 154 Mo. 545; Hughes v. Rader, 183 Mo. 630; Knapp v. St. Louis Trust Co., 199 Mo. 640. There was no such evidence in the case at bar. (4) The undue influence contemplated by law, which it was necessary for appellant to show, was such influence as dominated the will of the testator at the time of its execution. And such influence must amount to "over persuasion, coercion, or force, destroying the free agency and will power of the testator." Jackson v. Hardin, 83 Mo. 185; Gibony v. Foster, 230 Mo. 106, 137; McFadin v. Catron, 138 Mo. 197; Brinkmann v. Rueggesick, 71 Mo. 553; Campbell v. Carlisle, 162 Mo. 646; Winn v. Grier, 217 Mo. 459; Nook v. Zuck, 233 S. W. 238. No evidence of the above character was shown in the trial *nisi*. There was no evidence that the devisees or legatees, or any one of them, coerced, persuaded, induced, or procured testator to make his will as he did. Furthermore, there was no evidence that any such devisees or legatees knew that deceased had made a will or contemplated making a will. (5) Nor does the existence of the motive and opportunity for undue influence, in the absence of affirmative

evidence of its exercise, warrant the presumption of such influence in a case where the testator's mind is unimpaired and where he had an opportunity to and did understand, as in this case, the provisions of the will. McFadin v. Catron, 138 Mo. 197. (6) The presumption is always in favor of the validity of the will, and the mere fact of unjust discrimination in its provisions without more, does not shift the burden on the defendants. Inequality alone raises no presumption of undue influence, even though the testator gives nearly all of his estate to his legatees. McFadin v. Catron, 120 Mo. 252; McFadin v. Catron, 138 Mo. 197; Farmer v. Farmer, 129 Mo. 530; Maddox v. Maddox, 114 Mo. 35; Berberet v. Berberet, 131 Mo. 399. (7) Even though testator's sister, Rachael Dennis, who resided with him, may have said to plaintiff's mother, "Now that we have our brother back to help support us you can't have him any more; we will see to it that he will not leave any of his property to you or to your child," yet such statements were made to witness, according to her testimony, before she left Saline County, which was thirty-three years before the execution of the will. These statements were too remote to have any probative force of undue influence on testator at the time of the execution of his will and should not have been admitted in evidence. Ketchum v. Stearns, 76 Mo. 396; Fulton v. Freeland, 219 Mo. 494. Besides, such statements were mere hearsay and entitled to little weight, even if they had not been so remote. (8) The statements made by testator to plaintiff's mother and other witnesses some time between 1871 and 1879, and those made by testator to plaintiff in 1892, were no evidence of any undue influence by the defendants over the mind of testator at the time of the execution of the will. Statements or remarks made by a testator, not contemporaneous with the making of the will, are evidence only of the state of his mind at those times and not evidence of the truth of the facts so stated, and they are not to be taken as true for the purpose of

establishing undue influence and defeating the will. Coldwell v. Coldwell, 228 S. W. 95; Hayes v. Hayes, 242 Mo. 155; Teckenbrock v. McLaughlin, 209 Mo. 533; Crowson v. Crowson, 172 Mo. 691, 703. (9) The only evidence excluded by the court as to gifts of property made to any of the defendants was the offer to show by David N. Goodloe and by Rachael Dennis that deceased gave said Rachael Dennis, his sister about $4000 in Liberty bonds in 1919, and the court did not err in excluding this testimony. This was seven years after the will was made and could have no possible tendency to show undue influence over the mind of the testator at the time of the execution of his will in 1912. Meier v. Buchter, 197 Mo. 68.

SMALL, C.—Appeal from the Circuit Court of Saline County. Suit to contest the will of Davis P. Dennis, who died in said county on July 22, 1918. Said will was dated April 6, 1912, and admitted to probate August 9, 1918. Petition to contest filed by plaintiff, Ollie Gott, January 7, 1919.

The testator died seized of property in said county of the value of $45,000 or $50,000. By said will he bequeathed to his daughter, plaintiff Ollie Gott, who was his only child, the sum of $500, disposing of the rest of his property as follows: Rachael A. Dennis, a sister, $1000; Narcissa Goodloe, a sister, $250; Annie B. Igo, a niece, $250; said three bequests to be paid out of his personal estate. He next divided the balance of his personal property into fourteen equal shares, giving one share to each of his nieces and nephews, five of whom were the children of his sister, Mrs. Igo, deceased; six were the children of his sister, Narcissa Goodloe, and one was the only son and child of his brother, Austin Dennis, and two shares to the children of two deceased children of Mrs. Igo. He then directed that all of his real estate be sold and the proceeds equally divided among his following-named nephews and nieces, each

to receive one-tenth: Charles R. Igo, Sarah C. Swisher, Samuel S. Igo, Annie B. Igo, W. Austin Dennis, John H. Goodloe, David N. Goodloe, Higgins L. Goodloe, Sarah C. Collins and Arch L. Goodloe.

He appointed by his will his brother, John Austin Dennis, and Mr. Leonard D. Murrell, his executors, without bond. His will was witnessed by Charles Niemeier, J. T. Fisher and Jacob Van Dyke.

All the legatees and devisees of the testator, as well as the executors of his will, were made defendants in the contest proceedings. The ground of the contest stated by plaintiff, contestant, was want of mental capacity and undue influence over testator by defendants. The defendants filed answer denying the grounds of contest, propounded said will and prayed that same be adjudged to be the last will and testament of said Dennis.

At the trial, which was commenced September 29, 1919, after making formal proof of the probate thereof, proponents introduced Charles Niemeier and Jacob Van Dyke, who testified to the due signing and executing of the will by testator before them as witnesses, and that he was then and there of sound mind and memory. They also testified to the attestation of · said will by J. T. Fisher, another witness to the will, but who was deceased at the time of trial.

Van Dyke also testified that he had lived in Marshall since 1867; became acquainted with Davis P. Dennis in 1878, when he rented land to Dennis. Saw him occasionally from that time on during his life time. Saw him on the day he made his will, April 6, 1912. "Mr. Dennis came into my office and asked me to write his will, and took me apart and said what he wanted written in his will, and I took it down in pencil and afterwards wrote the will. I don't think Mr. Dennis came in on that day and signed it. I think it was a different date. But I wrote that will from a memorandum that he gave me and he came in and read it over and signed it just as it was written. He said it was just the way he wanted

it." On cross-examination witness said: "Don't know that he discussed his property with me at that time. He spoke to me about having a daughter, yes, really, that was the first time I knew he had a daughter, when he spoke to me about writing his will. The first thing he said to me was, 'I want to leave my daughter, Mrs. Gott —called her first name—$500.' That was the first item he gave me in writing the will. I recollect that very distinctly, because I did not know at that time that he really had a daughter. I don't believe he had any memoranda with him. Would not say as to that, do not know who came to town with him that day, he came there by himself as far as I know. The day he signed the will he was not in my office very long."

The testimony for plaintiff, the contestant, was thereupon introduced and tended to show that about 1867 the Dennis family moved from Kentucky and settled on a rented farm near Napton in Saline County, Missouri. The family consisted of the two brothers, Davis and Austin, both single, who were then probably grown young men, Davis having been a soldier in the Confederate Army. With them came and lived three maiden sisters, Rachael, Catherine and Jane, as well as the mother. They lived together there for many years, two of the sisters, Catherine and Jane, and the mother dying there before the trial. The brother, Austin, continued to live at the home place until he married—just when he married is not shown—and remained there after his marriage with his wife and child some time. From the time they moved to Missouri, the brothers were partners in farming. They were prosperous and acquired the ownership of the farm they had rented and lived on, as well as another eighty acres adjoining, and still another farm of some two hundred acres in the same neighborhood. The deeds to all the land were made in the joint names of both the brothers. Just when these farms were acquired does not appear in the evidence, but it was after 1871. It is inferable that it was some years before

1911 or 1912 when the brothers dissolved their partnership in farming and divided their land, Austin receiving the 200-acre farm, to which he and his wife and child had removed from the home place a few years before, and Davis P. receiving the home place of 155 acres and the eighty acres adjoining. Just what personal property, if any, they then divided, is not shown by the record, but it is shown that when he died Davis had a half interest in some notes aggregating $5000 or $6000, which were payable to himself and his brother Austin. Davis had no bank account in his own name, but the bank account was in the name of Dennis Brothers up to the time of his death. How much was in that account does not appear. There were also ten shares of bank stock in the name of Dennis Brothers. Austin was put on the stand by the plaintiff and he testified, in effect, that he and his brother were partners all their lives after "we got to attending to business at all, it was before I was twenty-one." About the same time, 1867, a married sister of Mr. Dennis, Mrs. Goodloe, and her family of some seven children, also moved from Kentucky and settled on a farm near her brother and mother in Saline County. Another sister, Mrs. Igo, had died in Kentucky. She, also, had seven children, and at an early day, probably about the time the Dennises came to Missouri, they also removed from Kentucky and settled near their uncle's place. All of the Dennises, the Igoes and Goodloes, with the exception of two or three of the latter, continued to live near each other, part of the Igoes and Goodloes living at times with the Dennises at the home place.

Shortly after the Dennises came to Missouri, a Mrs. Shelton and her family also removed from Kentucky and settled in Saline County, a mile or so from the Dennis home. Mrs. Shelton had a daughter by her first husband, Martha Senter. In 1871, Davis P. Dennis married Miss Senter. They were married at her mother's home, where they lived together for about one month, during which

time Mr. Dennis would each day go to his home and attend to his work upon his farm and return to his bride's home about sundown. At the expiration of the month Dennis ceased to live with his wife, and returned to his own home, where he remained the balance of his life. The plaintiff was born of this marriage, January 13, 1872. She and her mother continued to reside with Mrs. Shelton, the mother and grandmother, until about the year 1879, when Mrs. Dennis removed with her child to Carthage, Missouri, where they resided until some time after 1888, in which year in September, plaintiff, then being something over sixteen years of age, was married to Mr. Gott. She and her husband afterwards removed from Carthage and lived in St. Louis during the World's Fair, in 1904, and removed from Missouri to the State of Washington in 1907. Before 1879, when Mrs. Dennis moved to Carthage, the exact time does not appear, she obtained a divorce from Davis P. Dennis. There is some suggestion in the record that it was on the ground of abandonment, but she testified it was not upon that ground. As to the cause of the separation between Mr. and Mrs. Dennis, there was evidence that Mr. Dennis said at the time and often thereafter, that it was because his folks or family objected to his living with his wife and made him trouble on that account. The evidence shows that, notwithstanding he continued to live at his own home with his people, he frequently visited his wife and child, treated them with affection and furnished them with money for their support until they removed to Carthage, and that thereafter he wrote them affectionate letters and furnished them with money, contributing to their support, until his daughter was married in 1888.

In 1900, Mrs. Dennis married a Mr. Neelis, and they lived at Joplin until 1904, when he died. She then made her home with her daughter, Mrs. Gott and family, and removed in 1907 with them to the State of Washington. Plaintiff's mother testified that before she

moved to Carthage she and her husband had arranged to get married again, but he wanted her to wait, and gave as a reason that it was on account of his family troubles. That afterwards while at Carthage she got a letter from Mr. Dennis which she had lost, as to which she testifies as follows: "I got a letter that he would meet me and my daughter at a certain time Thanksgiving, and that we would be re-married again, and I answered his letter and our correspondence was broken off somehow; I never got any answer from him, so I did not know why he did not come. . . . I left [Saline County] and waited for him to come for years, don't know how many years. I waited from the time I got my divorce until 1900." That was the year she married Mr. Neelis. Plaintiff's mother also identified certain letters which she received from Mr. Dennis in 1888 and 1889, as being in his handwriting. They were as follows:

"Napton Mo. Sept. 19, '88. Matie—Yours of the 18th to hand I am always glad to hear from you and Ollie I had a letter from Olie since she was married I am negligent about writing wil answer Olies letter soon I was glad to hear from you I hope you are not mistaken about Olie marrying a good man I am pleased from what you say of him while I know you hate to give hir up I know you are a sensible woman and know she is better of if she is suited I hope she may always be happy She wrote me she would send me hir picture I would like to have it and hir husbands also wil write hir concerning it I hope you may hav a better and easier time and may never see our Child in need you deserve al the prase as I have done nothing for Olie while I owe Olie a Fathers care Mattie I always felt that I owed more to you than any one else hope you wil not hav to work so hard now and that you may soon be able to live with Olie and har plenty without working in that old factory if Olie gets to house keeping I think I wil go and see hir some time and would like to see you then if you are not living with hir I wil let you know when I will go to see hir dont tel hir good by as ever D P Dennis.

"Mattie Yours of late date come due to hand I also got a letter from you sometime since I writen you that I would go to se Olie some time I cant tel when I wil go I am very busy now and winter coming on wil let you know when I am coming Cant tel when at present dont ;el Olie any thing about it as it would make hir. anxious you hav not told me anything about Mr. Got what is he doing is he a farmer tel me what his ocupation is is his father living and what his Sircumstances is how how much family has he &c tel me al about Mr. Got go and see Olie and see how she is getting along I wil come some time if I can and see hir, As ever, D. P. Dennis, Napton Mo. Nov. 8, '88.

"Napton Mo. Nov. 21 '88 Mattie Yours of late date to hand would like to come to and see Olie Thanksgiving but my business is so I cant wil let you know when I am coming Cant tell when hope She is wel I must write to hir soon as Ever, D. P. Dennis.

"Napton Mo Jan 14 89 Mattie Yours the 16 Dec come due to hand was glad to hear you was wel and had been to se Olie and they was comfortably fixed for the winter I have not writen to Olie yet I hav forgot hir Street and Number wil write as soon as I hear from you no nuse that would interest yo Mrs Senter your brothers wife was burried last Monday She had Punmonia fever was sick but a few dayes hope to hear from you soon I am as ever D. P. Dennis."

After her marriage to Mr. Neelis, plaintiff's mother never had any further communication with her first husband.

In 1892, plaintiff, Mrs. Gott, visited her father and other relatives in Saline County. She had two or three uncles, probably her mother's brothers, living there. She testifies as to this visit:

"My father came to my uncle's, my uncle that lived near Napton, and took me home; he said he came to take me home, that he wanted me to get ready and go with him, and I did and I visited in his home. I think he

referred to the home being his and he said for me to call
it my home, that it was my home and would be my home,
but that is about all at that time. That was in the year
1892. I don't distinctly remember how long I visited
there with my father, it could not have been more than
two weeks I don't think, that is, not constantly; he took
me to visit Mr. and Mrs. Swinney, they lived near Ar-
row Rock, and he said I will come for you Saturday, and
so he would come. He did not seem to be satisfied to
let me stay longer than a week at any time whenever I
would go away, and then I went to my uncle's, but he
did not take me that time, I went horseback and stayed
a few days. I was back here just once to see my father,
only made one visit. Well, I made other visits to Black-
water, but only the once to my father's house. When I
visited my father there was living with him his brother,
Austin, and his wife and child, and his sister Rachael
and Sam Igo.

"Q. Now you may state how your Aunt Rachael
and your Uncle Austin treated you on that visit. A.
Well, I don't remember that my Uncle Austin said any-
thing; he spoke to me on occasions, but he did not enter
into conversation with me, and my Aunt Rachael only
spoke of common occurrences of the day. Well, I can-
not remember what they said, for it wasn't anything of
importance, and it did not bear on my life formerly nor
in the past, and they treated me, on the whole, cool, and
they never sat with my father of evenings when he would
be in the house, and of course I felt as though I was ex-
pected to stay with them, and when he would be in his
room, which was downstairs in the living room, they
would go off to their rooms, retire, and of course I did
not feel like staying down there alone with him, and that
is about the way they treated me. When I left, my
father took me over to Blackwater because my trunk
was there. On the way over to Blackwater he spoke of
my mother, and spoke very affectionately of her, and
spoke of her being a good woman, and he gave her all

the praise for what she had done in raising and taking care of me, and for me to look after her and see that she was cared for and that I should have his property at his death.

"Q. What did he say there about re-marrying her? A. He said that they were corresponding at the time of my marriage and that they intended, he intended, to re-marry her, but that on account of his family troubles at home he could not; he was influenced by them.

"Cross-examination: In 1892 was the first visit I made back there after I left. I was then living in St. Louis; went west in 1907. I said my aunt went off to her room and that I did not feel like staying down there with father. I had a room with my aunt, then I went upstairs where she was, it was a large house. I got there in September, 1892. My uncle's wife met me at Blackwater. I visited two or three families on that trip. I had three uncles here. My husband was not with me."

Plaintiff's mother further testified that while she still lived in Saline County and after she separated from her husband he always expressed great fondness for his daughter and said he expected to leave all his property to her when he died; that on one occasion during that time the two sisters, Rachael and Jane, told her that she and her husband should not live together; that Jane said "now that we have our brother back to help support us you cannot have him any more," and she said, "We will see to it that he will not leave any of his property to you or your child." Rachael said the same thing. Austin Dennis was not there and did not join in the conversation. Mr. Shelton, the half-brother of plaintiff's mother, who knew Mr. Dennis and his relations and who lived in the same neighborhood until after Mr. Dennis died, also testified to a number of conversations with Mr. Dennis to the effect that he was very fond of his child, and that Dennis told him at the time of the separation and a number of times thereafter, that the reason he could not live with his wife was on account of his family, they made trouble between him and his wife, and that

he said that he expected to provide for them in the future and see that they should never want for anything—he expected his daughter to inherit what he had left. He always spoke kindly with reference to his wife and child—always. The last conversation he had with Mr. Dennis about his sister was about a year before his death. There was other testimony to the effect that Mr. Dennis spoke of the plaintiff to others as his little girl, and that she "favored" him and that "he was proud of her." That was in 1892.

Being recalled, the plaintiff testified that after she moved to Washington she wrote letters to her father. That she was not notified of his death by any of defendants or anyone, and that she only ascertained that he was dead a week or so afterwards by reading a notice of his death in a newspaper published at Marshall for which she was a subscriber.

There was also testimony tending to prove that the deceased indulged in intoxicating liquor for many years before his death, but no one testified to seeing him under the influence of liquor except once at Jim Jones's sale, the time of which the witness was unable to fix. That he had several spells of pneumonia several years before his death, but that he was in good health about a year before his death until his last sickness, which lasted only three or four days. The age of Mr. Dennis is not exactly shown, but one witness who said he was a soldier in the Union Army, said that Mr. Dennis was a soldier in the Confederate Army and was three or four years older than he was, so that Mr. Dennis must have been well advanced in years, nearly, if not quite, eighty years old when he died, in 1918.

Austin Dennis, the brother, testified for plaintiff that he never spoke to his brother about what disposition he should make of his property by his will, and that he never knew he made a will until after his death.

Rachael Dennis, the sister, also was placed on the stand for the plaintiff, but she simply testified that she had always lived with her brother, and she was not asked

and she did not testify to anything relating to the making of his will.   She did testify, however, that before his death her brother gave her a ten or twelve hundred-dollar automobile, and on objection of respondents' counsel she was not permitted to testify as to whether her brother gave her $4000 in Liberty Bonds, which plaintiff offered to prove that she had and claimed that her brother had given them to her.   To this ruling plaintiff excepted.

Plaintiff also put a doctor on the stand who testified that from the tremulous character of his signature to the will in question he was of the opinion that the testator had the palsy when he signed his will, which indicated that his mental faculties were not absolutely normal, but to what degree he could not state, and said to counsel, "I leave that for you to say." He also said that a man who has a handwriting like that (referring to the signature to the will) could not have absolute control over his will power, but he would not say that any man that writes a tremulous hand is insane.   Another witness for plaintiff said that Rachael Dennis told him after the will was probated that she was not satisfied with the $1000 bequeathed to her.

This was the substance of the evidence in the case. Thereupon the court gave a peremptory instruction to the jury to find for the defendants and that the will in question was the last will and testament of Davis P. Dennis.   To this instruction plaintiff excepted.   The verdict being rendered as directed and judgment entered thereon, plaintiff filed motion for new trial, which was denied and she duly appealed to this court.

I.   It is contended that there was evidence of undue influence being exerted upon the testator* by the defendants, especially by Austin Dennis and Rachael Dennis, the brother and sister of the testator, to practically disinherit the plaintiff, the testator's only child and heir by his will, in favor of his collateral relatives, which included all the defendants. In such cases direct evidence of undue

Proof: Circumstantial Evidence.

influence is not necessary. It may be proved by circumstantial evidence. [Mowry v. Norman, 204 Mo. 193; Bradford v. Blossom, 190 Mo. 119; Meier v. Buchter, 197 Mo. 68; Coldwell v. Coldwell, 228 S. W. l. c. 103; Ray v. Walker, 240 S. W. l. c. 194.]

II. But the circumstance that the testator expressed the greatest affection for plaintiff and said he intended to leave his property to her, either before or after the execution of his will, standing alone, is not

Affection: Expressed Intention.

enough to show undue influence sufficient to set aside the will, but does show her father's state of mind toward her and is competent with other evidence of undue influence on that issue. [Coldwell v. Coldwell, 228 S. W. l. c. 104; Canty v. Halpin, 242 S. W. 94; Kuehn v. Ritter, 233 S. W. 5.]

III. It is also well settled that gross inequality in the distribution of the testator's bounty amongst those by law and nature entitled to share equally therein, or perhaps, even in disinheriting his only child in favor of

Inequality.

collateral relatives, *standing alone,* would not raise a presumption of undue influence sufficient to invalidate the will, but such unjust discrimination would tend to show undue influence when there are other facts and circumstances in the record also tending to show such influence. [Meier v. Buchter, 197 Mo. l. c. 87-90; Ray v. Walker, 240 S. W. l. c. 195-96.]

IV. In this case testator's affection for his daughter and gross discrimination against her do not stand alone. The testimony of the witness Shelton that the testator declared at the time of his separation from his wife that he "hated to do it," but did it on account of "his

Facts Proving Undue Influence.

family making him trouble" may not be definite and circumstantial enough to make such declaration part of the *res gestae,* still, under the above authorities, it is admissible as tending to show his mental attitude towards his bride

of a month and towards his family, to-wit—that of regret to part from her and subserviency to the will of his family. [Canty v. Halpin, and other cases, supra.] There are other circumstances bearing on the issue of undue influence. When he was married to plaintiff's mother the testator's three maiden sisters and mother all lived with him and were dependent on him for support, and while he and his brother, who also lived with him, were partners, the evidence shows that Davis P. Dennis was the head and front of the firm and family, the moneymaker. So that for him to take unto himself a wife and children foreshadowed a great loss to his "family," to-wit, his mother and three maiden sisters and perhaps his brother also. The family therefore had a strong motive to object to and nullify his marriage and the consequences thereof to them so far as in them lay. That it was their influence that made him desert his bride at the very threshold of the altar, without fault on her part, and *cleave* to his mother, sisters and brother, and not to his wife, contrary to his own inclination and contrary to human and divine law, is the only reasonable explanation of his most unnatural and unlawful conduct.

In Meier v. Buchter, 197 Mo. l. c. 91, we said: "It is not necessary to cite authorities to sustain the proposition that undue influence need not be shown by direct proof, *but may be established by proof of facts from which it may be rationally inferred.*" Ever since Sarah unduly influenced Abraham (who also "hated to do it") to send Hagar and Ishmael into the wilderness with but a bottle of water and a loaf of bread, in order that Sarah's son, Isaac, might inherit all of Abraham's property and Ishmael should not receive his share, human nature has remained the same, and undue influence has been exercised by many other members of the family, as good as Sarah, upon fathers as strong-minded as Abraham, to cause them to make Ishmaelites of their children and deprive them of their inheritance. But such conduct has never been sanctioned by the law of Moses or

Missouri. We hold, therefore, that the circumstantial evidence in this case tends to show that the testator's "family" exercised such undue influence over him at the very outset of his married life as to separate him from his wife and child against his will, in order to deprive them of their lawful rights in his property. Undue influence being once shown to exist is presumed to continue. [Gay v. Gillilan, 92 Mo. 264.]

But in this case its continuance is not left to presumption. There was much testimony to show that the same influence continued to dominate him throughout his life. He continued to reside with his family and be surrounded by the same influences until he died. He never married again and never again attempted to leave his family, but his affection and solicitude for his deserted wife and child always continued. This was not only shown by the testimony of the plaintiff and the mother and others, but also by his letters (with their phonetic spelling) of 1888 and 1889, which letters also show that his conscience pricked him. Mr. Shelton testified that as late as the year before his death the testator spoke with kindness of his former wife and his daughter. Both the wife and daughter testified that he said he wanted to re-marry his wife, but that his family objected and prevented it. This testimony as to conversations with the testator, of course, is not competent to show the truth of the declarations thus attributed to him, but is competent to show his mental state towards his wife and child and towards his family, and that it continued to remain one of affection for the former and subserviency to the latter. [Coldwell v. Coldwell, 228 S. W. 104, and other cases, supra.] It is true there are circumstances pointing the other way. His long absence from his wife and child and the scant communication between them for several years before and after they moved to Washington, is shown. But plaintiff testified she wrote letters to her father after she went to Washington to which she received no answers, which

may not have been her father's fault, because plaintiff's evidence shows her father spoke with kindness concerning her the year before he died. It is also true that Austin Dennis and Rachael Dennis were put on the stand by plaintiff, and Austin testified he never said anything to the testator about his will or knew he made a will until he died. But Rachael was silent on this subject, and both were silent as to how their brother happened to desert his wife and child and always live with them. If their silence is not evidence against them, it is not for them. Their testimony in no manner rebutted, as a matter of law, the testimony of plaintiff, her mother and others tending to show that such desertion in the first place and thereafter continued during the life of the testator was caused by the undue influence of the Dennis family, including defendants Austin and Rachael. We also think that an influence so powerful as to thus dominate the testator and cause him to leave his wife and child to whom he was greatly attached, *out of his life,* would cause him to leave his child (his wife having remarried) *out of his will.* At least, the jury might so infer.

Furthermore: All the flotsam and jetsam in the record tend to indicate undue influence as the only rational examination of the testator's most unnatural treatment of his wife and child. Apparently none of his family attended his wedding, none of them ever visited his wife, or invited her to visit them, and she was never at his house. None of his family, although they lived with him and were cared for and supported by him, ever visited his child or invited her to visit them or him at his house, although she lived only a mile or so away for the first six or seven years of her life. Apparently the testator himself never invited or took his child to his home, although he visited her often at her mother's home before they moved to Carthage, and treated her with great affection, took her upon his lap and kissed and caressed her as any loving father would do. It is also inferable that on such occasions this child also "ran to lisp her

sire's return and climb his knee, the envied kiss to share.'' His letters in evidence show that ten years after she moved to Carthage he planned to visit his daughter, but they contained no invitation for her to visit him at his home. As far as the evidence shows, the only time in her life she was at her father's house was in 1892, four years after her marriage, when he invited her to visit him, while she was in the neighborhood visiting an uncle. While there she was treated with coolness by Austin Dennis and his wife and Rachael Dennis. Her father, however, treated her with great kindness and affection. She also visited her uncle a time or two when she did not go to her father's house; whether she was invited or not does not appear. None of this large family of her father's folk ever visited her or ever invited her to visit them except Sam Igo, who called on her once for a few moments, while attending the World's Fair in 1904, at St. Louis, where plaintiff and her husband then resided. So this only child, who was fond of her father and whose father was fond and proud of her, was not even notified of his last sickness or death by any of the numerous members of her father's family, although all of them were beneficiaries of his will. So completely, the jury might infer had they crowded her out of her father's life and usurped her place that they no longer even considered her her father's child. Or, perchance, the short time she had to contest his will under our recent statutes—one year from its probate—admonished them to remain silent until the year had passed. The continued affection for so many years of the deserted child and mother for the husband and father who had banished them without fault on their part, even before his child was born, tends strongly to show that they knew their banishment was due to the influence of others which he was helpless to resist. Otherwise, they would have been consumed with hate and bitterness. *Res ipsa loquitur.* In case of an apparently grossly unjust and unnatural will like this it is the duty of the court to scan the record

carefully for all facts and circumstances that may bear on the issues. [Meier v. Buchter, 197 Mo. 1. c. 88; Wendling v. Bowden, 252 Mo. 688.] Accordingly, we have referred to the details of the evidence with more than usual fullness, and we hold there is substantial circumstantial evidence that this will was the offspring of long years of undue influence on the part of the testator's family.

V. We hold, therefore, there being evidence of undue influence in this case, besides the gross inequality and unnatural discrimination of the testator against his daughter in his will, that such unnatural discrimination itself becomes evidence of such undue influence, and the burden of proof on the issue of undue influence was thereby shifted from the contestant to the proponents the same as where a confidential relation is shown. [Roberts v. Bartlett, 190 Mo. 680; Gay v. Gillilan, 92 Mo. 264; Meier v. Buchter, 197 Mo. 1. c. 88-90; Ray v. Walker, 240 S. W. 1. c. 195-96; McFadin v. Catron, 120 Mo. 252.]

Unnatural Discrimination: Burden of Proof.

VI. We are not unmindful of the general rule that isolated verbal declarations of the testator said to have been made many years before his death are entitled to but little weight in such cases and frequently do not constitute substantial evidence. In this case, however, such declarations cover the whole period of the testator's long life subsequent to his marriage to within about a year before his death and constitute one continued and connected story as to his mental attitude towards his wife and child as well as towards his family. Furthermore, they are confirmed by his letters written about eighteen years after his marriage and separation from his wife and child and about twenty-five years before he made his will. The genuineness of these letters is not questioned. They show

Verbal Declarations.

he blamed himself for his failure to give a father's care to his child, hoped she was happy and would never be in need and praised his former wife for the manner in which she had cared for and raised her. Also, that he *always felt* that he owed more to his wife than any one else, who he hoped would not continue to have to work so hard and that she would soon be able to live with "Ollie" (who had just married Mr. Gott) and have plenty "without working in that old factory." He also promised in these letters to visit his wife and daughter, but cautioned his wife not to tell his daughter, as it would make her anxious. There is parole testimony that the testator's regard and solicitude for his child and former wife continued until at least one year before his death, five years after he made his will, when the witness Shelton testified he spoke with kindness regarding them. Under the circumstances in this case we hold that none of the declarations of the testator shown in evidence should be excluded from the jury because of their remoteness from the time the will was made. [Kuehn v. Ritter, 233 S. W. l. c. 7, and cases cited.]

VII. It is not sufficient to show that no overt acts of undue influence were exerted on the testator at the very time his will was made. If such undue influence was previously acquired and was operative at the time of making his will in the disposition of his property his will became thereby vitiated—all of which may be shown by facts and circumstances in evidence. Direct testimony is not necessary. [Mowry v. Norman, 204 Mo. l. c. 193, and cases cited.]

Overt Acts.

VIII. It may, however, be urged that there is no evidence that the nieces and nephews to whom he willed the greater part of his property had any hand in such evil influence over him. But we hold that even though they had no part therein they are the beneficiaries thereof, and without which the will they claim under would not have been made. Where there is evidence tending to

Beneficiaries of Evil Influence.

prove, as we hold there is in this case, that the whole will was made under undue influence of the Dennis family operating upon the testator from the time of his marriage in 1871, until after his will was made, the whole will is infected with the virus of illegality, and must be set aside, although some, or even all, of the beneficiaries had no part in the act which produced the will. In the case of Teckenbrock v. McLaughlin, 209 Mo. l. c. 542, this court said: ''A will that is shown by competent proof to be in fact the product of undue influence of one devisee or legatee, out of several, is as much void as if it was the product of the undue influence of all of them— is a bad will. The innocent may not take property as the result of a tainted devise or bequest merely because they are free of the vice. A gift fetched by an unchaste hand may well be held to be polluted.'' [Same ruling in Roberts v. Bartlett, 190 Mo. 703.]

IX. We hold that the statements of Jane and Rachael Dennis to the plaintiff's mother after her separation from their brother to the effect that they would see to it that their brother did not live with her again

Statements of Beneficiaries.

and that neither she nor the plaintiff, her child, would ever get any of his property, were inadmissible as against the nieces and nephews who were the principal beneficiaries in the will. [Teckenbrock v. McLaughlin, 209 Mo. l. c. 541-42; Schierbaum v. Schemme, 157 Mo. 1; James v. Fairall, 134 N. W. 608, 38 L. R. A. (N. S.) 735, and notes.]

X. But we think in this case where the roots of the issues permeate the whole life of the testator after his marriage his declarations and acts up to the time of his death regarding his transactions with his family or any

Acts After Will's Execution.

member thereof are admissible to show whether or not their previous relation and *status* towards each other continued to exist. Therefore, the evidence of and the facts

surrounding, the gift to Rachael Dennis of the Liberty Bonds should have been received, although it was after the will was made. It might tend to show why he did not change his will during the six years he lived after its execution.

XI. We are also of opinion that the "harsh and unnatural disposition by the will in question," with the harsh, unnatural and paradoxical treatment of his wife and child in his lifetime and his subjection to "his folks," which the evidence tended to show, "is a circumstance which tends to discredit the maker's testamentary capacity." [Schouler on Wills (3 Ed.) sec. 77; 1 Underhill on Wills, sec. 105; Page on Wills, sec. 385.] The above doctrine of the text-writers was quoted at length and with approval by this court in Meier v. Buchter, 197 Mo. l. c. 87 et seq., and in Ray v. Walker, 240 S. W. l. c. 195. The other facts bearing on the testator's physical condition shown in evidence were also competent circumstances on both the issue of undue influence and testamentary capacity.

The result is, the judgment of the lower court is reversed and the case remanded with directions to set aside the judgment herein and grant the plaintiff a new trial in accordance with the principles announced in our opinion. *Brown* and *Ragland, CC.,* concur.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur, except *James T. Blair, J.,* in what is said of mental capacity in paragraph 11.